Robert J. SCALLET, Plaintiff,

v.

John W. ROSENBLUM,
et al., Defendants.

Civil A. No. 94–0016–C.

United States District Court,
W.D. Virginia,
Charlottesville Division.

Jan. 18, 1996.

 

VA, Beth C. Hodsdon, University of Virginia, Charlottesville, VA, Lee E. Goodman, University of Virginia, Office of General Counsel, Charlottesville, VA, for Thomas Jackson, Daniel Hallahan, Robert Harris, John Casteen and John Buckman.

Lee E. Goodman, University of Virginia Office of General Counsel, Charlottesville, VA, for Rector & Visitors of University of Virginia.

## MEMORANDUM OPINION

MICHAEL, District Judge.

Plaintiff, a non-tenured instructor at the University of Virginia's Darden Graduate School of Business ("Darden"), brings this action pursuant to 42 U.S.C. § 1983, alleging that the defendants, three senior Darden faculty members, violated rights secured to Plaintiff under the First Amendment by refusing to renew his teaching contract in retaliation for his outspokenness on issues of "diversity" at Darden. Plaintiff seeks injunctive relief and damages for this alleged violation of his constitutional rights. Plaintiff has also brought defamation claims against the defendants for statements they made to the faculty member assigned to investigate the defendants' actions. Plaintiff contends that these statements were designed to effectuate a coverup of the true reasons defendants took the action they did.

This matter is currently before the court on defendants' motion for summary judgment. For the reasons stated herein, the court grants the motion with respect to the First Amendment claim. Consequently, the court declines to exercise supplemental jurisdiction over the state-law defamation claims, *see* 28 U.S.C. § 1367(c)(3), and, therefore, will not address the merits of those claims.

### I. Undisputed Facts

The following facts are undisputed. Plaintiff Robert J. Scallet became a full-time faculty member at Darden in 1988.[1] At Darden, Scallet taught a section of the Analysis and Communications course ("A & C"), a writing and speech class that all students are required to take in their first year at Darden.

Frederick Theodore Heblich, Jr., Parker, McElwain & Jacobs, P.C., Charlottesville, VA, Edward A. Scallet, Washington, DC, for Robert J. Scallet.

Alison Paige Landry, Office of Attorney General, Richmond, VA, Earl C. Dudley, Jr., Office of General Counsel University of Virginia, Charlottesville, VA, James J. Mingle, General Counsel's Office, University of Virginia, Charlottesville, VA, Beth C. Hodsdon, University of Virginia, Charlottesville, VA, Lee E. Goodman, University of Virginia Office of General Counsel, Charlottesville, VA, for John Rosenblum and Clyde Ray Smith.

Earl C. Dudley, Jr., Office of General Counsel, University of Virginia, Charlottesville, VA, James J. Mingle, General Counsel's Office, University of Virginia, Charlottesville,

---

1. Scallet became a part-time faculty member in 1985.

Scallet also had administrative responsibilities within the A & C department, serving as Course Head beginning in 1988. Scallet's responsibilities as Course Head included administering the course, managing other A & C faculty, and developing the curriculum for A & C. Def.Exh. 47, *Scallet Dep.* at 35–49.

Scallet was a strong advocate of "diversity" while at Darden. By that term, it is understood that Scallet championed, among other things, the goal of broadening both the traditional focus of classroom materials so as to make them more accessible to women and minorities, and the traditional underpinnings of the business community itself, so as to make that sphere more hospitable to the same.

In the fall of 1991, Defendant Smith, an Associate Dean at Darden, asked Scallet to take some "pieces of paper" off of the wall outside his office. Def.Exh. 37, *Smith Dep.* at 145–148. Those pieces of paper consisted of various articles and cartoons that Scallet had posted. Pl.Exh. 38.

In late April or early May of 1992, Defendant Harris, another Associate Dean at Darden, met with Scallet and suggested to him that his contract would be renewed for the 1992–1993 academic year. Def.Exh. 45, *Harris Dep.* at 448 ("I had told [Scallet] . . . that it would be my recommendation that he had the position at Darden the following year"); Def.Exh. 46, *Rosenblum Dep.* at 245–46. Defendant Harris made the statement to Scallet "[b]ecause I, I felt that [Scallet] continued to be able to deliver some good instruction to the Darden students." *Id.* at 641. A few days later, however, Defendants Smith and Harris, together with Defendant Rosenblum, the Dean of Darden, met with the other members of the A & C faculty to discuss, outside of Scallet's presence, reported problems the A & C faculty were having

with Scallet. At that meeting, the faculty members expressed concerns about their collective ability to continue working with Scallet. *See, e.g.,* Def.Exh. 13, *Helscher Aff.* At ¶ 8; Def.Exh. 8, *Rubin Aff.* At ¶ 14. A short time after this meeting, Dean Rosenblum informed Scallet that he would be relieved of his teaching duties for the 1992–1993 academic year [2] and that his contract would not be renewed thereafter. Def.Exh. 46, *Rosenblum Dep.* at 287; *Complaint* ¶ 31.[3]

In response, Scallet filed a grievance petition with the University in October 1992, seeking review of the adverse action. In his petition, Scallet alleged that Dean Rosenblum failed to renew his contract on account of Scallet's outspoken views regarding issues of diversity and "multiculturalism" at Darden. Scallet's request for review prompted an internal investigation that culminated in a report prepared by Defendant Daniel Hallahan, a Professor in the School of Education and a member of the Faculty Relations Committee. That report contained comments from various faculty members at Darden, including Dean Rosenblum, to the effect that Scallet was an ineffective faculty member who possessed character defects. The report, issued in March 1993, concluded that there was no support for Scallet's contention that he was retaliated against for his remarks about diversity. Pl.Exh. 1 at p. 7. However, the report contained a comment attributed to Defendant Rosenblum that "[t]here were a few faculty who did not like [Scallet's] activist orientation to the course, . . . ." *Id.* at 4.

In March 1994, Scallet filed the current lawsuit, naming Dean Rosenblum and Associate Deans Harris and Smith as defendants. Scallet's amended complaint contains seven counts, of which Counts One, Three, Four and Five are still before the court.[4]

---

2. Scallet was offered an administrative position for that term.

3. All references to the complaint refer to the First Amended Complaint, filed on August 1, 1994. Scallet filed his first complaint in this action on March 22, 1994.

4. Count Two alleges violations of Scallet's right to due process secured by the Fourteenth Amendment. This court granted the defendants'

partial motion for summary judgment on that count in December 1994. Count Six states a defamation claim against Professor Hallahan stemming from the issuance of his report to the President of the University. The Magistrate Judge recommended dismissing this count on the grounds that there was no evidence in the record that Hallahan acted with actual malice in preparing his report. Scallet has not filed an objection to this recommendation and conceded at oral

Count One alleges that the defendants, acting in their personal capacities, violated Scallet's First Amendment rights by taking adverse employment action against him in response to Scallet's remarks about diversity, in violation of 42 U.S.C. § 1983.[5] [Because of its disposition, the court does not address defendants' argument that they enjoy qualified immunity for their actions]. Counts Three, Four and Five state individual defamation claims against defendants Rosenblum, Smith and Harris, respectively, for the statements they made to Professor Hallahan in the course of Professor Hallahan's investigation.

## II. Disputed Facts

### A.

The speech that Scallet alleges caused defendants to take the adverse action against him falls into three categories: (1) classroom discussions; (2) comments made by Scallet in faculty meetings; and (3) articles and cartoons posted by Scallet on the wall outside of his office. These three categories of speech are described briefly below.

First, Scallet contends that defendants objected to the content of his classroom discussions. Scallet maintains that "[s]enior faculty members were threatened by ... the issues Scallet was discussing in the classroom." *Complaint* ¶ 23. Scallet points to comments by Defendant Harris to Plaintiff that "[Smith] and the others want all the social and political content stripped from your course." Pl.Exh.Tab 1, *Scallet Dep.* at 259. Specifically, Defendant Harris allegedly told Scallet that senior faculty members objected to Scallet's discussion of "power relationships" in corporate organization and his

teaching the movie "Roger and Me."[6] *Id.* at 133, 136. Indeed, one senior faculty member expressed concerns about Scallet's showing a "commie" movie at Darden. *Id.* At 115. Furthermore, Defendant Harris allegedly told Scallet that members of the faculty did not approve of two cases he used in class. One involved the target-marketing of cigarettes to African-Americans and the other featured an Asian woman as the key decision-maker. *Complaint* ¶ 25. Defendant Harris did not indicate whether the senior faculty disagreed with the social and political content of the materials or if they thought it was pedagogically inappropriate. Pl.Exh. Tab 1, *Scallet Dep.* at 259. And as noted above, Defendant Rosenblum told Professor Hallahan that "[t]here were a few faculty who did not like [Scallet's] activist orientation to the course,...." Def.Exh. 1 at 4.

Scallet further contends that his 1991 request for summer funding was denied because he intended to use the grant to develop course materials that touched upon social and political issues. He was allegedly told by Defendant Harris that "[w]e don't want you doing that. Cross that off the list." Pl.Exh. Tab 1, *Scallet Dep.* at 258. More generally, Scallet claims that he was reprimanded on one occasion by Defendant Smith who stated that he "hated my tone, he hated ... the minority material I taught. He found me dangerous, he found me evil, I was undermining his objectives for the school,...." *Id.* at 222. During this same discussion, Defendant Smith allegedly intimated to Scallet that he had been trying to get Scallet fired for two years and stated "now I am going to do it." *Id.*[7] When Scallet ultimately confronted Defendant Rosenblum about

argument before this court that he did not intend to object to the recommended disposition of Count Six. Accordingly, the court grants defendants' motion for summary judgment with respect to Count Six without further discussion. Count Seven alleges breach of contract by the University. That count was dismissed as moot by this court on December 20, 1994.

**5.** The court notes that Scallet's claim under the First Amendment is "not defeated by the fact that he did not have tenure. Even though he could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him, he may none-

theless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977) (citations omitted).

**6.** The movie is a documentary about General Motors plant closings in Flint, Michigan. *Scallet Deposition* at 112.

**7.** Defendant Smith denies that he made such statements.

the non-renewal and asked whether Defendant Smith was the catalyst for it and further whether Rosenblum felt pressure to support Smith because Smith was an extremely influential member of the Darden faculty who could help safeguard Rosenblum's own position at Darden, Rosenblum allegedly stated, "Yes, you've got most of the story. There are some details you don't have." *Id.* at 381.

Second, Scallet contends that defendants objected to Scallet's expression of views in faculty meetings concerning the "importance of developing case material that ... reflect[ed] the experiences of women and minorities in the workplace" and "the ways in which issues of social responsibility in business could be incorporated into classroom discussions." *Complaint* ¶ 27, Pl.Exh.Tab 1, *Scallet Dep.* at 471–472. Defendant Harris allegedly told Plaintiff that he should mute his expression of views at faculty meetings because his "advocacy of certain views was ticking people off." *Id.* at 254. Scallet claims that "[s]ome senior faculty objected to my public expression of views related to Darden's pedagogy, the institution's position on academic freedom, faculty governance, the institution's mission statement, and the school's difficulty in incorporating diversity into its core curriculum." *Plaintiff's Answer to Interrogatory # 16.* Scallet does not provide examples of specific comments to which defendants expressed concerns.[8]

Third, Scallet maintains that defendants objected to the materials Scallet posted on his door and on the wall outside his office. Specifically, Scallet alleges that Defendant Smith "complained about articles on the wall outside of Scallet's office dealing with issues of diversity in communications and ordered Scallet to remove them so that students could not see them." *Complaint* ¶ 26. The material at issue included a Guide to Nonsexist Language, a Doonesbury cartoon lampooning the prevalence of dual-track education for boys and girls, and an article concerning business and the environment. Pl. Exh. 38; Pl.Exh.Tab 1, *Scallet Dep.* at 346–351. Defendant Smith allegedly admonished

Scallet that, "I want all this stuff gone," *id.* at 349, and "I don't like the students reading that stuff." *Id.* at 351.

Thus, it is Scallet's contention that the defendants did not renew his contract for the 1993–1994 academic year, and relieved him of his teaching responsibilities for the 1992–1993 term, because they did not approve of the views he expressed regarding issues of diversity in the contexts discussed above. Scallet makes this argument in light of a political schism Scallet alleges existed on campus between advocates of diversity and those wedded to what Scallet terms "the Darden Way." As evidence of this schism, Scallet points to a May 1992 Report of the Ad Hoc Committee on the Status of Women at Darden, wherein the Committee concluded that "[t]here are widely held perceptions by the faculty that ... there is an inability (or an unwillingness) to address the underlying issues that diversity is creating. This has allowed particular problems to escalate to destructive proportion." Pl.Exh. 35 at 4.

### B.

Defendants, in contrast, maintain that Scallet's contract was not renewed because he lacked essential collegiality skills that made it impossible for other members of the A & C faculty to coexist with him. Defendants also suggest that Scallet's classroom discussions disrupted the effective delivery of the A & C course and trenched upon course material taught outside the A & C department.

Defendants maintain that there were at least two complaints lodged against Scallet by members of the A & C faculty. Specifically, some members of the A & C faculty complained that Scallet had threatened them with termination if they did not agree to teach more class hours. Def.Exh. 47, *Scallet Dep.* at 232–237; Def.Exh. 37, *Smith Dep.* at 89–90. In addition, one A & C faculty member, Paula Wenger, protested to Defendant Harris that Plaintiff had excluded her from the hiring process of a potential A & C faculty member. Def.Exh. 47, *Scallet Dep.*

---

8. Scallet conceded that Mr. Smith did not express concern about Scallet's remarks at faculty

meetings. Def.Exh. 47, *Scallet Dep.* at 478–479.

at 237. This latter dispute, defendants allege, mushroomed into a heated confrontation in a basement classroom between Scallet and Ms. Wenger, who was eight-months pregnant at the time. Defendants maintain that Scallet accosted Ms. Wenger so thoroughly about her going to Associate Dean Harris behind Scallet's back that she thereafter feared Scallet, refusing to work with Scallet alone, or even to be in the building with him at the same time. Def.Exh. 35, *Wenger Dep.* at 171–179, 224–227; Def.Exh. 14, *Birch Aff.* ¶ 6 ("She was absolutely white and shaking.... She could hardly speak"). As a result of these complaints, Defendant Harris, in the spring of 1991, relieved Scallet of his management responsibilities over A & C, Def.Exh. 47, *Scallet Dep.* at 228, 243, 251–252, and took over the administration of the A & C course himself. *Id.* at 257–259.

The record indicates that Scallet had altercations with other female A & C instructors. During the winter of 1988–1989, Elizabeth Denton, who was pregnant, missed a speech class due to illness and was castigated by Scallet. Def.Exh. 3, *Denton Aff.* at ¶ 9. Ms. Denton eventually left Darden in part because of the treatment she received from Scallet during her tenure. *Id.* at ¶ 3. Scallet also allegedly subjected Virginia Germino to unwelcome details of his sex life. Def.Exh. 36, *Germino Dep.* at 303. There is evidence in the record as well that female students "dreaded" Scallet's classes because he made them feel uncomfortable and because his use of profanity interfered with their ability to focus on the material. Def.Exh. 14, *Birch Aff.* ¶ 9.

In addition to harassing colleagues, defendants maintain that Scallet fostered division within the A & C faculty and actually sabotaged some of his peers' classes. Defendants cite an instance wherein Scallet allegedly told a colleague, who was preparing to lecture Scallet's and Ms. Wenger's class, to present one type of lecture even though the students were expecting a different type of lecture. Scallet allegedly chuckled when the technician confronted him because, Scallet believed, Ms. Wenger would ultimately be held responsible for the gaffe. Def.Exh. 7, *Arbogast Aff.* at ¶ 10–11.

Defendants also point out that each and every member of the A & C faculty who served with Scallet testified that Scallet was extremely difficult to work with because he fostered an environment of fear and distrust, especially among the female faculty. *See* Def.Exh. 6, *Vaughn Aff.* ¶ 3–5 ("he personalized disagreements ... acted as a law onto himself ... engendered a climate of distrust"); Def.Exh. 4, *Howard Aff.* ¶ 3–4 ("I found working with him very difficult and unsettling, and so I attempted to avoid him as much as possible"); Def.Exh. 36, *Germino Dep.* at 304–307 ("I was afraid of him.... I hated going in to my job"); Def.Exh. 7, *Arbogast Aff.* ¶ 2 ("I personally experienced Cid Scallet undermine me and Paula Wenger in a lecture before sixty students").

Defendants argue that Scallet created problems within A & C by failing to teach the same material taught by other A & C faculty. This failure, defendants allege, disrupted the A & C agenda because A & C was supposed to be taught in a uniform fashion so that students from different sections could more easily interact outside the classroom. Def. Exh. 8, *Rubin Aff.* at ¶ 9. Scallet's deviations from the program, defendants contend, disrupted the classes of other A & C faculty because students protested the divergence. *Id.* ("students complained to me at the beginning of class that they did not think they should have to perform the assignment because students in Cid Scallet's class were doing something else. It was a significant disruption in my class"); Def.Exh 13, *Helscher Aff.* ¶ 8 ("we had to teach a separate course from Cid and that created intolerable tension among us"). Most significantly, defendants allege that the Scallet's classroom material trenched upon material taught by other teachers throughout Darden, some of whom expressed concerns about Scallet's course content. Def.Exh. 47, *Scallet Dep.* at 98, 108, 146. The record indicates that two operations professors expressed concern "that we were teaching material that stepped on the toes of the Operations course." *Id.* at 146. In addition, a Marketing professor asked "what the heck we were doing teaching a marketing case in A & C?" *Id.* at 108. All of these concerns, and some others, were

voiced at the May 1992 meeting between the defendants and the other members of the A & C faculty.[9]

Thus, defendants argue that they took the adverse action against Scallet because his disruption of the A & C mandate, accomplished both through the material he taught and through the ways in which he abrasively interacted with his colleagues, created an untenable situation that warranted, indeed necessitated, the action taken.

## C.

Scallet suggests that defendants' proffered reasons for the non-renewal are pretextual. Specifically, Scallet maintains that he was an effective teacher who was able to work successfully with other members of the A & C faculty, given considerable structural strains present within the department. In his view, it is patently incredible that the defendants would fail to renew his contract based upon the accusations of members of the A & C faculty.

Scallet maintains that "[i]t was well-known at Darden that Plaintiff was one of the most successful and popular faculty members ... among the students." *Complaint* ¶ 22; *Megibow Aff.* ¶ 3 ("I was struck by the parade of students who came to Mr. Scallet for help of all kinds"). Indeed, one month before the non-renewal, Scallet was nominated by the student body for a major teaching award. More than half of the first-year class signed the nominating petition. Pl.Exh. C ("As a teacher in the classroom, [Scallet] is unparalleled in his ability to communicate and instill in students the desire to make learning a fundamental part of their lives"). Scallet also paints himself as an outstanding colleague, willing to collaborate with anyone to solve any problem plaguing Darden. *See Beckenstein Aff.* ¶ 3 ("Of the ten course heads with whom I worked, Mr. Scallet was one of the most helpful and valuable.... I could not think of a better team player").

With respect to the A & C faculty, Scallet argues that whatever tension existed was a product of the fact that Scallet was the only full-time instructor. Other A & C instructors worked as little as 3 hours per week, Pl.Exh. 24, and interaction between the A & C faculty outside formal meetings, was sparse. Pl.Exh.Tab 1, *Germino Dep.* at 43–44. In fact, Scallet maintains that he interacted more with the Associate Director of Placement than he did with the other A & C faculty. Pl.Exh.Tab 1, *Scallet Dep.* at 596. This structural deficiency, Scallet alleges created friction. Indeed, Scallet's successor as Course Head of A & C, Jon Megibow, states that shortly after he assumed control of A & C, one of the A & C faculty complained to Defendant Harris about a change Mr. Megibow had made in the curriculum. Upon learning of the complaint, Mr. Megibow told the instructor that his conduct was unprofessional and threatened to fire him. *Megibow Aff.* At ¶ 9. Mr. Megibow concluded that "[i]n some of the instructors, there was a clear lack of commitment to the course and their jobs, at least in part because of the part-time nature of their positions. Others were contentious and had no sense of reasonable faculty behavior—they were unable to put the course ahead of their private agendas or to work as members of the team." *Id.* at ¶ 10.

Scallet maintains that it strains credulity to suggest that Scallet's interactions with the A & C faculty prompted his non-renewal—especially in light of the depth of his popularity with the students and his demonstrated collegial disposition with other faculty members outside the A & C department. Moreover, Scallet argues that the absence of any documentation in his personnel file evidencing any criticism, the failure of the defendants to allow him to respond to the criticism leveled against him in his absence at the final A & C faculty meeting with the defendants, and the fact that Defendant Harris had told Scallet just days before the adverse action was taken that he would recommend that Scallet's contract be renewed, all belie defendants' assertion that Scallet's professional conduct in some way precipitated the action taken.

**9.** There is also evidence in the record that at least one case Scallet taught offended some students because the word "nigger" appeared as did a reference to the male sexual organ. Def.Exh. 47, *Scallet Dep.* at 70–76, 86.

### III. Summary Judgment

■ Upon a motion for summary judgment, the court will consider the evidence and affidavits of the parties in light of the pleadings, drawing all facts and inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979). The defendants are entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c).

■ The plaintiff is entitled to have the credibility of all his evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Before the plaintiff must face the burden of demonstrating the existence of a triable issue of fact, the defendants must meet their burden of showing the absence of evidence to support plaintiff's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *see also Cray Communications, Inc. v. Novatel Computer Systems, Inc.,* 33 F.3d 390, 393–394 (4th Cir.1994). There must be more than a "scintilla" of evidence to support plaintiff's case. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Rather, the evidence must be sufficient to "return of verdict" for plaintiff at trial. *Id.*

### IV. Analysis

#### A. Choosing a Legal Framework

■ It is axiomatic that "[a] state may not dismiss a public school teacher because of the teacher's exercise of speech protected by the First Amendment." *Stroman v. Colleton County Sch. Dist.,* 981 F.2d 152, 155–56 (4th Cir.1992); *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of expres-

sion"). Determining, however, the exact scope of a teacher's first amendment protections is an intricate endeavor.

■ In *Pickering v. Board Of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court articulated a test for identifying the scope of first amendment protection afforded teachers' out-of-class speech. In *Pickering,* the Court held that lower courts must strike a balance "between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734–35. The balancing test which this pronouncement spawned is, obviously, germane to the analysis of Scallet's out-of-class speech—that is, to Scallet's remarks at faculty meetings and to his placement of articles and cartoons outside his office—and it will be employed for that purpose.

However, Scallet also alleges that the defendants retaliated against him for his in-class speech. The Supreme Court, though, has never spoken to the level of first amendment protection afforded teachers' in-class speech. *See* Note, *Public School Teachers and the First Amendment: Protecting the Right to Teach,* 65 N.Y.U.L.REV. 693, 696 (1990) ("No Supreme Court opinion ... has analyzed directly the protection that the first amendment affords teachers in the classroom").

Lower federal courts have sought to fill this void in several ways. *See generally, id.* (discussing first amendment rights of primary and secondary school teachers' classroom speech). Some courts have simply appropriated *Pickering*'s balancing test for use in the context of the university classroom. *See, e.g., Dambrot v. Central Michigan University,* 55 F.3d 1177 (6th Cir.1995); *Blum v. Schlegel,* 18 F.3d 1005 (2d Cir.1994); *Martin v. Parrish,* 805 F.2d 583 (5th Cir.1986); *Cohen v. San Bernardino Valley College,* 883 F.Supp. 1407 (C.D.Cal.1995).[10]

---

10. The Second Circuit appeared to adopt the *Pickering* test in *Blum v. Schlegel,* 18 F.3d 1005

(2d Cir.1994). In that case, a state law school professor claimed that he was denied tenure be-

Other courts have looked to such Supreme Court cases as *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) and *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), where the Court discussed the scope of students' first amendment rights in the classroom. *See, e.g. Ward v. Hickey*, 996 F.2d 448 (1st Cir.1993) (discussing *Hazelwood*); *Miles v. Denver Public Schools*, 944 F.2d 773 (10th Cir.1991) (same); *Zykan v. Warsaw Community Sch. Corp.*, 631 F.2d 1300, 1306–07 (7th Cir.1980) (dicta) (discussing *Tinker*); *James v. Bd. of Educ.*, 461 F.2d 566, 571–75 (2d Cir.) (same), *cert. denied*, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972). For example, in *Miles v. Denver Public Schools*, 944 F.2d 773 (10th Cir.1991), the court adopted a two-prong test derived from *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), where the Supreme Court held that "[e]ducators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. at 571. Extending the holding in *Hazelwood* to the in-class expression of a ninth grade teacher, the *Miles* court held that a school may restrict a teacher's in-class ex-

pression if (1) it has a legitimate pedagogical interest in abridging the speech; and (2) the school's restriction on the speech is reasonably related to that interest.

The *Miles* court declined to use the *Pickering* balancing test, stating that while "the *Pickering* test accounts for the state's interests as an employer, it does not address the significant interests of the state as educator." *Id.* at 777. The court articulated those "significant interests" as assuring "that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Id.* (quoting *Hazelwood*, 484 U.S. at 271, 108 S.Ct. at 570). The court acknowledged that *Hazelwood* involved students' expression in a secondary school and not teachers' expression in the classroom. However, the court concluded that there is "no reason to distinguish between students and teachers where classroom discussion is concerned." *Id.* (internal quotation omitted).

Finally, at least one court has fashioned its own balancing test. *See Bishop v. Aronov*, 926 F.2d 1066 (11th Cir.1991), *cert. denied*, 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992).[11]

cause "*[i]n classes* and in campus publications, Blum advocated the legalization of marijuana and criticized national drug control policy. For example, Blum in his First Amendment class set a number of hypotheticals in the context of the current drug war. Blum also published two pieces in a campus publication and participated in a debate regarding civil disobedience." *Id.* at 1011–12 (internal citation, quotation and footnote omitted) (emphasis supplied).

The Second Circuit did not distinguish between Blum's in-class remarks and pedagogy on the one hand, and his out-of-class expressions, on the other. Instead, the court simply applied the *Pickering* balancing test to Blum's speech as a whole. Specifically, the court held that Blum's speech interest outweighed the efficiency interest proffered by the University as a justification for restricting Blum's speech. The court held that "the efficient provision of services by a State university's law school actually depends, to a degree, on the dissemination in public fora of controversial speech implicating matters of public concern. Blum's speech, therefore, does not impair the interests of the state in efficient provision of services through its law school." *Id.*

Since the court did not distinguish between Blum's out-of-class expressions and his classroom expression, it is difficult to tell whether the court actually endorsed the *Pickering* test for use in the context of a law school classroom. It is clear, however, that the court endorsed a broad conception of protected speech in the graduate school setting.

11. In this case, Dr. Bishop, a university professor of exercise physiology, interjected his religious beliefs into classroom discussions, telling students that he modeled his life after Christ because he felt that it was "the wisest thing I can do." *Id.* at 1068. He informed students that they need not share his views but that they should understand his "bias." The university required that Dr. Bishop discontinue his "interjection of religious beliefs and/or preferences during instructional time periods." *Id.* at 1069.

In analyzing Dr. Bishop's claim that the university's restraint of his classroom speech violated the First Amendment, the court created its own multi-factor test, based upon its reading of *Hazelwood*. First, the court noted the classroom

In the absence of clear guidance, this court will apply the *Pickering* balancing test to determine the level of first amendment protection afforded Scallet's in-class speech. The court notes that the cases in which the *Hazelwood* test is employed do not address the in-class speech of teachers at the university or graduate school level. Rather, those cases deal with the in-class speech of secondary school teachers. Thus, the "significant interests" discussed in *Hazelwood* that justify the restriction, in certain instances, of teachers' in-class speech, are not implicated to the same extent, if at all, in the context of higher education. Certainly the interest in assuring "that readers or listeners are not exposed to material that may be inappropriate for their level of maturity" is not implicated in the graduate school context. *Hazelwood*, 484 U.S. at 271, 108 S.Ct. at 570. Furthermore, the interest in assuring that "the views of the individual speaker are not erroneously attributed to the school" is not as strongly implicated in the context of higher education, where students are not so easily cowed by the assertion of the apparent authority the classroom fosters. *Id.* In addition, while the Supreme Court has recognized that communities have a legitimate interest in attempting to inculcate certain values in students through public education, *see*, *e.g.*, *Bd. of Educ. v. Pico*, 457 U.S. 853, 863–64, 102 S.Ct. 2799, 2807–07, 73 L.Ed.2d 435 (1982) (plurality opinion) (courts should allow

school boards freedom to set school curriculum in manner that transmits community values to students), achieving some sort of uniform value system is not part of the mandate of higher education. Indeed, it is anathema to the intellectually maverick environments of the university and graduate school. *See Tilton v. Richardson*, 403 U.S. 672, 685–686, 91 S.Ct. 2091, 2099–2100, 29 L.Ed.2d 790 (1971).[12] Thus, the pedagogical interest in restricting teacher's in-class speech is not as strongly implicated in the context of higher education.

Thus, the court opts for the *Pickering* test. The court notes that it has reservations about extending the *Pickering* analysis to the in-class speech of university professors and graduate school instructors since the test does not explicitly account for the robust tradition of academic freedom in those quarters. *See Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom"). However, the court concludes that this interest can be accounted for within the parameters of the balancing test by properly defining the extent of the teacher's interest in the speech.[13] Accord-

context of the speech, stating that such a context forced the court to consider the "coercive effect upon students that a professor's speech inherently possesses and that the University may wish to avoid." *Id.* at 1074. Indeed, student complaints regarding Professor Bishop's religious remarks suggested that the students felt coerced by them. *Id.* Second, the court considered the university's position as a public employer "which may reasonably restrict the speech rights of employees more readily than the those [sic] of other persons." *Id.* In this vein, the court considered "the University's authority to reasonably control the content of its curriculum, particularly that content imparted during class time." *Id.* The court also considered the possibility that classroom speech could "give[] the appearance of endorsement by the university." *Id.* Finally, the court considered "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Id.* at 1075. Applying this balance, the court concluded that "the University's interests in the classroom con-

duct of its professors are sufficient ... to warrant the reasonable restrictions it has imposed on Dr. Bishop." *Id.* at 1076.

12. Moreover, *Hazelwood* concerned itself with students' in-class speech, not with the in-class speech of teachers. Although the *Miles* court did not view this as a significant difference, this court suggests that it might be since teachers are the ones charged with pushing the intellectual envelope.

13. The court notes that it declines to rely on the *Bishop* case, *see* n. 11, *supra*. because the Establishment Clause concerns that lurked throughout the analysis in that case are wholly absent from the current case. *See Bishop*, 926 F.2d at 1077 ("Because of the potential establishment conflict, even the appearance of proselytizing by a professor should be a real concern to the University"); *id.* at 1074 (noting that classroom speech could "give[] the appearance of endorsement by the University") Thus, the court concludes that the

ingly, the court turns below to the *Pickering* analysis.

### B. Explicating the Chosen Framework

■■■ In an effort to achieve the balance described in *Pickering*, the Fourth Circuit has developed a three-prong test to analyze the level of first amendment protection afforded the speech of government employees. First, the court must determine "whether [Plaintiff's] speech involved an issue of public concern." *Hall v. Marion Sch. Dist No. 2*, 31 F.3d 183, 192 (4th Cir.1994). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–148, 103 S.Ct. 1684, 1690–1691, 75 L.Ed.2d 708 (1983). Such an inquiry is one of law for the court to undertake. *Id.* at 148 n. 7, 103 S.Ct. at 1690–91 n. 7. The Supreme Court in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), made the following comments with respect to distinguishing expression relating to public concerns from purely private expression:

> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment

> \* \* \* \* \* \*

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review

the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick*, 461 U.S. at 146–147, 103 S.Ct. at 1690. The Fourth Circuit has narrowed the inquiry under the first prong, holding that "[t]he focus is ... upon whether the 'public' or the 'community' is likely to be concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a 'private' matter between employer and employee." *Berger v. Battaglia*, 779 F.2d 992, 999 (4th Cir.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986).

■■■ Second, if the speech at issue does relate to an issue of public concern, then the court must next "decide whether [Plaintiff's] exercise of free speech is outweighed by the 'countervailing interest of the state in providing the public service the teacher was hired to provide.'"[14] *Id.* at 192 (quoting *Stroman v. Colleton County Sch. Dst.*, 981 F.2d 152, 156 (4th Cir.1992)). This determination is a question of law. *Id.* at 194. In making its judgment on this element, the court may consider whether the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987) (citing *Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735–37): Moreover, "[w]hen an employee's speech substantially involves matters of public concern, ... the state must make a stronger showing of disruption in order to prevail." *Hall*, 31 F.3d at 195 (citing *Connick*, 461 U.S. at 152, 103

issue addressed in *Bishop* limits the relevance of its analysis. *See* Michael A. Olivas, *Reflections on Professorial Academic Freedom: Second Thoughts on the Third "Essential Freedom"*, 45 STAN.L.REV. 1835, 1847 (1993) ("Th[e] holding exceeds by a wide margin the rationale necessary to find for the University. The court could have fashioned a more carefully reasoned argument, based on higher education precedents, that religion is *sui generis*, that supplementary lectures and personal remarks on religious beliefs are highly suggestive, that religious views are not

germane to an exercise physiology (or math) class, and that a faculty committee had reviewed the matter and given Bishop the opportunity to explain his pedagogical choices").

14. The court in *Hall* discussed this part last. However, the Fourth Circuit has commented that "[s]ince each part affords a possible independent basis for judgment, the order of inquiry may vary with the circumstances of the case." *Daniels v. Quinn*, 801 F.2d 687, 689 (4th Cir.1986).

S.Ct. at 1692–93); *see also Bieluch v. Sullivan,* 999 F.2d 666, 671 (2d Cir.1993) ("If the employee's speech substantially involved matters of public concern, the government must make a stronger showing of interference with operations than occurred in *Connick*"), *cert. denied,* ── U.S. ──, 114 S.Ct. 926, 127 L.Ed.2d 219 (1994).

█ Third, the court must determine "whether [Plaintiff] would have been dismissed 'but for' her protected speech." *Id.* This inquiry is a factual one and involves two steps.

> In the first step, the employee bears the burden of establishing the requisite causation to prove that the protected speech was a motivating factor or played a substantial role in the discharge. *Mt. Healthy City Sch. Dist. Bd. Of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. [568] at 576, 50 L.Ed.2d 471 (1977). If the employee is able to prove such, the second step shifts the burden to the employer to put forward evidence that it would have fired the employee even in the absence of the protected speech. *Id.*

*Id.* at 193.

The court undertakes this three-pronged analysis below, first with respect to Scallet's in-class speech, next with respect to Scallet's remarks in faculty meetings, and finally with respect to the articles and cartoons Scallet posted on his office door and on the wall outside his office. However, the court will defer discussion of the third prong—the causation prong—until it has addressed whether all three categories of speech are protected under the first two prongs. For if they are, the court must address the causation prong in light of that finding so as to avoid analyzing the issue in piecemeal fashion. For instance, it would be inappropriate for the court to find that, by itself, each category of speech was not the "but for" cause of defendants' action, when, if examined together, it becomes apparent that Scallet's protected speech as a whole was the cause of the non-renewal.

### C. Applying the Framework: Protected Speech

#### 1. Classroom Speech

Scallet contends that the defendants failed to renew his contract for the 1993–1994 academic year, and relieved him of his teaching responsibilities for the 1992–1993 term, in part, because of the issues Scallet discussed in the classroom.

Under the *Pickering* analysis, the court must first determine as a matter of law, whether the general classroom discussions Scallet initiated and the classroom material Scallet presented, relate to matters of public concern.

Defendants contend that Scallet's classroom speech relates simply to issues of curriculum which cannot be characterized as matters of public concern. Rather, defendants maintain, Scallet was simply discharging his duties as an employee of Darden when he made his classroom remarks, thereby stripping them of any public relevance. Defendants cite *Holland v. Rimmer,* 25 F.3d 1251 (4th Cir.1994) for the proposition that "in-house communications between employees *speaking as employees,*" *id.* at 1256, cannot relate to matters of public concern. In *Holland,* a county Director of Social Services claimed that he was terminated in response to the "internal discipline meted out by [Plaintiff] to his subordinates." *Id.* at 1255. Plaintiff claimed that his communications with his subordinates was protected by the First Amendment.

█ Defendants' reliance on *Holland* is misplaced. Unlike the plaintiff in *Holland,* Scallet, as an educator, routinely and necessarily discusses issues of public concern when *speaking as an employee.* Indeed, it is part of his educational mandate. *See* Note, *Public School Teachers and the First Amendment: Protecting the Right to Teach,* 65 N.Y.U.L.REV. 693, 702 (1990) ("[A] teacher's in-class expression has dramatic public repercussions because of its role in educating students. A teacher's speech ... offers students ideas and arguments that may be very much a part of public debate ...").

█ More importantly, defendants' argument seriously misconceives the relevance of classroom debate in our democratic society. To suggest that the First Amendment, as a

matter of law, is never implicated when a professor speaks in class, is fantastic. "[F]or decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation 'that cast a pall of orthodoxy' over the free exchange of ideas in the classroom." *Dube v. State University of New York*, 900 F.2d 587, 598 (2d Cir.1990) (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991)). Indeed, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," *Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960); As the Supreme Court stated in *Sweezy v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957):

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.... Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Id.* at 250, 77 S.Ct. at 1211–12; *see also Wieman v. Updegraff*, 344 U.S. 183, 195, 73 S.Ct. 215, 220–21, 97 L.Ed. 216 (1952) (Frankfurter, J., concurring) (unwarranted inhibition of thought chills "that free play of the spirit which all teachers ought especially to cultivate and practice").

Thus, the First Amendment is routinely implicated in the classroom, both at the university level and below. *See, e.g., Dube, supra.* (Professor's classroom remarks equating Zionism with Nazism and apartheid protected under First Amendment); *Blum v. Schlegel*, 18 F.3d 1005, 1011 (2d Cir.1994) (law professor's in-class advocacy of legalizing marijuana protected under First Amendment); *Kingsville Independent Sch. Dist. v.*

*Cooper*, 611 F.2d 1109 (5th Cir.1980) (high school teachers use of controversial play-acting to teach history of Reconstruction protected by First Amendment); *Minarcini v. Strongsville Sch. Dist.*, 541 F.2d 577 (6th Cir.1976); *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir.1969).

In short, defendants' sweeping argument that a university instructor's classroom remarks, as a matter of law, cannot be characterized as addressing matters of public concern warranting first amendment protection, fails to convince.

 Of course, not all classroom speech implicates matters of public concern. *See Dambrot v. Central Michigan University*, 55 F.3d 1177 (6th Cir.1995) (college basketball coach's use of the word "nigger" not protected under First Amendment because did not relate to a matter of public concern); *Martin v. Parrish*, 805 F.2d 583 (5th Cir. 1986) (cursing in classroom not protected under First Amendment because not an issue of public concern). However, it appears unassailable that Scallet's advocacy of diversity, through the materials he taught in class, relate to matters of public concern. Debate is incessant over the role of diversity in higher education, employment and government contracting, just to name a few spheres. Indeed, political debate over issues such as affirmative action is inescapable.

Thus, the court concludes that Scallet's classroom speech concerning diversity relates to a core issue of public concern. *See Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir.1994) (finding, in part, that law professor's use of in-class hypotheticals as mechanism to advocate the legalization of marijuana "on its face implicates [a] matter[ ] of public concern"); *Cohen v. San Bernardino Valley College*, 883 F.Supp. 1407, 1417 (C.D.Cal.1995) (concluding after surveying case law, that tenured professor's classroom discussions and assignments on pornography "are matters of concern to the community and thus are topics of public concern").

Moreover, the fact that Scallet's statements were made in the classroom and not in the public square does not strip them of their inherently public quality. In *Connick*, the Court noted that in *Givhan v. Western Line*

*Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979),

we held that First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publicly. Although the subject matter of Mrs. Givhan's statements were not issues before the Court, it is clear that her statements concerning the School District's allegedly racially discriminatory policies involved a matter of public concern.

*Connick,* 461 U.S. at 146, 103 S.Ct. at 1689; *see also Mumford v. Godfried,* 52 F.3d 756, 759–60 (8th Cir.1995), *and cases cited therein.*

In sum, the context of Scallet's classroom speech, that is as part of the A & C curriculum, does not metamorphosize speech addressing social issues into parochial musings, unrelated to the world beyond the ivory towers of the Business School.[15]

The court must next "decide whether [Plaintiff's] exercise of free speech is outweighed by the 'countervailing interest of the state in providing the public service the teacher was hired to provide.'" *Hall,* 31 F.3d at 192 (quoting *Stroman,* 981 F.2d at 156).

Defendants argue that the defendants' interest in controlling the A & C curriculum outweighs Professor Scallet's interest in his classroom speech.[16] Defendants argue that the course Professor Scallet taught was a "uniform writing and speech course, an integral part of Darden's required first-year curriculum. Each student received the same course material and was to receive the same instruction, although the course was taught in different sections by different instructors. There can be no doubt that Darden as an institution had a powerful interest in the content of the A & C curriculum and its coordination with the content of other re-

quired courses, . . . ." *Defendants' Memorandum* at 49.

Defendants maintain that Scallet's forays into issues of diversity caused significant disruption within the A & C department. Indeed, some students protested the divergence between the material taught in class sections. Defendants also suggest that Scallet's classroom speech intruded on the material taught by other teachers in other courses at Darden. And as an institutional matter, defendants maintain that it is the school's prerogative to decide whether business ethics and diversity issues are taught in the first-year Business Ethics class by a professor with an M.B.A., or by an instructor in the first-year writing and speech class who has no business background. *See* Def.Exh. 9, *Freeman Aff.* ¶ 4 (discussing first-year Business Ethics class). In short, defendants maintain that they needed to take control of the A & C curriculum and that the First Amendment does not prohibit them from doing so. *See e.g., Bradley v. Pittsburgh Bd. Of Educ.,* 910 F.2d 1172, 1176 (3d Cir.1990) (public school teachers have no right to choose "their own curriculum or classroom management techniques in contravention of school policy or dictates").

The court recognizes that it is called upon in this case to strike a difficult balance between important, competing interests. On the one hand, the court must consider Darden's educational mandate. On the other hand, the court must consider Scallet's status as an instructor at an institution of higher education. In this latter regard, the court must:

give weight to the nature of the employee's job in assessing the possible effect of his action on employee morale, discipline or efficiency. In so doing, it must be recognized that such effect may vary with the job occupied by the employee. In analyzing the weight to be given a particular job in this connection non-policymaking em-

---

**15.** Of course, this leaves unresolved the propriety of teaching multiculturalism and diversity in a class devoted to the teaching of writing and speech.

**16.** Defendants do not concede that they took the adverse action against Scallet because of his ex-

pressions regarding diversity. Rather, for purposes of summary judgment, they argue that even if they had taken the action to stifle Scallet's speech, they had a legitimate, constitutional reason for doing so.

ployees can be arrayed on a spectrum, from university professors at one end to policemen at the other. State inhibition of academic freedom is strongly disfavored.... In polar contrast is the discipline demanded of, and freedom correspondingly denied to policemen.

*Jurgensen v. Fairfax County, Va.*, 745 F.2d 868, 880 (4th Cir.1984) (citations omitted). Moreover, the court must consider that when, as here, "an employee's speech substantially involves matters of public concern, ... the state must make a stronger showing of disruption in order to prevail." *Hall*, 31 F.3d at 195 (citing *Connick*, 461 U.S. at 152, 103 S.Ct. at 1692–93).

■■■ In attempting to strike the proper balance, the court concludes that the resolution of the legal issue of whether Scallet's in-class speech is protected by the First Amendment, depends upon a factual resolution of whether Scallet's classroom speech did indeed disrupt, or sufficiently threaten to disrupt, Darden's educational mandate in a significant way. For if it did, the court concludes that the First Amendment provides no protection for Scallet's in-class speech. However, if Scallet's classroom speech did not undermine the A & C course, nor other classes at Darden, then the First Amendment protects that speech since the defendants offer no other countervailing interest in repressing it.

Although the court's analysis turns on the resolution of this factual issue, the analysis, at bottom, is a question of law that the court must resolve. *See Joyner v. Lancaster*, 815 F.2d 20, 23 (4th Cir.) ("Joyner contends that it is the province of a jury or fact finder to determine the underlying facts to which the court then applies the legal standard. The clear implication of *Connick*, however, is to the contrary"), *cert. denied*, 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987); *Jackson v.*

*Bair*, 851 F.2d 714 (4th Cir.), *withdrawn*, 863 F.2d 1162 (4th Cir.1988) ("as is often the case in constitutional litigation, these ultimate issues of constitutional law inevitably embrace subsidiary issues of pure historical fact which establish the context in which ... the appropriate balance of competing interests must be legally assessed in particular cases").

■■■ The court finds, as a factual matter, that Scallet's in-class speech, that is, his use of certain materials for classroom discussion, did disrupt Darden's pedagogical mission. The record indicates that tight control over the A & C curriculum was necessary to ensure uniformity across class sections.[17] The record further indicates that Scallet's in-class speech, in the form of the materials he used and the discussions those materials fostered, created disruption within the A & C department, hampering the school's ability effectively to deliver the A & C course to its students. Furthermore, there is evidence in the record that Scallet's use of particular material in his classes created divisions within the A & C faculty, a fact this court considers in striking its balance. *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987) (citing *Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735–37). Moreover, the record indicates that Scallet's in-class pedagogy adversely affected the functioning of Darden as a whole. It is undisputed that several faculty members outside the A & C department expressed concerns to Scallet about his class trenching upon their own.

The court notes that there is evidence in the record that could suggest that Scallet's classroom speech did not disrupt Darden's mission in any significant way. For example, it is undisputed that the A & C department still utilizes the "Hoffman" case even though that case drew complaints from members of the Darden faculty. Def.Exh. 8, *Rubin Aff.*

---

**17.** Scallet cites a 1992 memorandum for the proposition that uniformity across class sections was not required for effective delivery of the A & C course. The memorandum, written from Scallet to three other A & C instructors concerning two upcoming A & C classes, states "[i]t would be nice if we could put together a packet of material for those two classes that all of us would use." However, the memorandum concludes by stating that "[o]f course, if you would like to put together your own material to suit your own particular purposes, you should feel free to do so." Pl.Exh. 23. The court finds that this memorandum, relating to two specific classes in 1992, by itself, does not contradict other evidence in the record to the effect that the A & C course must be delivered in a uniform fashion to be effective.

¶ 16. If Scallet's use of that case did indeed intrude on other courses or created other problems within A & C, then it would be fair to assume that the case would have been dropped from the curriculum. However, the court must look at the entire record, and upon doing so, the court is convinced that Scallet's in-class speech was in fact disruptive.

Given the court's factual finding that Scallet's in-class speech was disruptive, the court concludes, as a matter of law, that the speech is not protected by the First Amendment. The State's interest in the effective administration of its duties outweighs Scallet's interest in teaching his own material, where teaching that material hampers the State's ability to fulfill its duties. *See Cohen v. San Bernardino Valley College*, 883 F.Supp. 1407 (C.D.Cal.1995) (holding that university professor's interest in discussing pornography in class, although an issue of public concern, outweighed by state's interest in effectively educating its students). Scallet could have found, and no doubt did, other, perhaps more appropriate, outlets for expressing his opinions about diversity. *See Bishop v. Aronov*, 926 F.2d 1066, 1076 (11th Cir.1991), *cert. denied*, 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992) ("The University has not suggested that Dr. Bishop cannot hold his particular views; express them, on his own time, far and wide and to whomever will listen; or write and publish, no doubt authoritatively, on them; nor could it so prohibit him"); *DiMeglio v. Haines*, 45 F.3d 790, 805–806 (4th Cir.1995) ("Even if [plaintiff] was speaking as a private citizen and on a matter of public concern ... it is still not

clear that his speech would have been protected, since the interest of the State in preventing disruption of the orderly management of its offices might well have outweighed [plaintiff]'s interests in expressing himself on the subject and in the manner, time, and place that he did").[18]

Thus, the court concludes that Scallet's in-class speech is not protected by the First Amendment.

### 2. Faculty Meetings

Scallet alleges that the defendants objected to his comments at faculty meetings regarding the "importance of developing case material that ... reflect[ed] the experiences of women and minorities in the workplace" and "the ways in which issues of social responsibility in business could be incorporated into classroom discussions. *Complaint* ¶ 27, Pl.Exh.Tab 1, *Scallet Dep.* at 471–472.[19] Scallet also contends that Defendant Harris told him that he should mute his expression of views at faculty meetings because his "advocacy of certain views was ticking people off." *Id.* at 254.[20]

██ It is manifest that Scallet's speech at faculty meetings related to matters of public concern. Scallet's expressed desire to reconstruct A & C cases to reflect the psychology of women and African–Americans in the workplace, although curricular in nature, cannot be said to relate to matters solely of institutional or personal concern since it also speaks to the general debate on multiculturalism that currently thrives in all quarters of American society. To characterize Scallet's remarks in faculty meetings as "essentially a 'private' matter between employer and em-

**18.** The court also concludes that Darden's interest in controlling the channels through which its students receive the curriculum outweighs Scallet's interest in his classroom speech. It is proper for Darden, as an institution, to cabin the teaching of certain material within certain fora if it believes that any other pedagogical regime would compromise the delivery of the material. Thus, if school administrators believe, as they apparently do, that a required first-year class on business ethics is the most appropriate forum in which to teach issues of diversity, they are entitled to make that judgment and to bring it to fruition. Otherwise, the court may well be engaged in that "intrusive oversight by the judiciary in the name of the First Amendment" cited in

*Connick, supra,* 461 U.S. at 146, 103 S.Ct. at 1689–90.

**19.** How this desire, once accomplished, would integrate in a curriculum designed for, and devoted to, writing and speech presents a pedagogical question properly to be resolved by the institution.

**20.** The court notes that it is unclear which specific statements Scallet made at faculty meetings allegedly motivated defendants to take the action they did. Scallet does not offer specifics. He simply claims that the defendants objected to his general comments. The court credits this assertion for purposes of the present analysis.

**1018**

ployee," *Berger,* 779 F.2d at 999 (4th Cir. 1985), mischaracterizes the nature of the expression. Scallet was speaking not as a disgruntled employee, about some issue of only parochial concern to him or in which he had some vested interest. *See Hanton v. Gilbert,* 36 F.3d 4, 7 (4th Cir.1994) (holding that speech related primarily to "personal dissatisfaction with the terms of ... employment" does not implicate matter of public concern); *Daniels v. Quinn,* 801 F.2d 687 (4th Cir. 1986) (statement by teacher that some course materials had not yet been received does not address a matter of public concern). Rather, Scallet was speaking as a concerned citizen, albeit one within the University community, who wished to advance a dialogue at Darden because he thought changes in society demanded that Darden engage in that dialogue.

And as discussed above, the fact that Scallet expressed his concerns about Darden's lack of sensitivity to issues of diversity in private faculty meetings, and not in the public square, does not strip those comments of their inherently public quality. *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *see also Mumford v. Godfried,* 52 F.3d 756, 761 (8th Cir.1995) (comments made by probationary faculty member in university's architecture department critical of the department's close relationship with the local architectural business community because, teacher alleged, local architectural business community exerted undue influence over curriculum, related to matter of public concern "even if his speech had been directed only to other members of the [university] faculty").

Thus, the court concludes that the remarks Scallet made at faculty meetings concerning diversity at Darden relate to matters of public concern.

Again, the court must next "decide whether [Plaintiff's] exercise of free speech is outweighed by the 'countervailing interest of the state in providing the public service the teacher was hired to provide.'" *Hall,* 31

F.3d at 192 (quoting *Stroman,* 981 F.2d at 156).

Scallet, of course, argues that the only interest defendants can assert in stifling his speech at faculty meetings is an improper one—specifically, to ensure the preservation of "the Darden Way" from encroachment by the progressive onslaught of diversity advocates.

Defendants deny that they wished to muzzle Scallet at faculty meetings, but state that to the effect that they did wish to do so it was because of Scallet's confrontational and argumentative style, not because of the content of his remarks. This argument addresses whether defendants would have renewed Scallet's contract "but for" his protected speech and does not suggest any counterbalance to Scallet's interest in expression under the present analysis.

Thus, the court concludes that Scallet's advocacy of diversity in faculty meetings is protected under the First Amendment because it relates to matters of public concern and because the defendants offer no competing interest served by stifling that speech.[21]

### 3. Posted Articles and Cartoons

Defendants do not contest that the various articles and Doonesbury cartoons that Scallet posted on his office door and wall relate to matters of public concern. Rather, defendants argue that Scallet was instructed to remove the items because they were harming the wallpaper and because they created an inaesthetic environment that harmed Darden's recruiting effort since Scallet's office was across the hall from Darden's Admissions' Office. Def.Exh. 37, *Smith Dep.* at 144–146.

The court concludes that defendants' aesthetic interest, if legitimate, does not outweigh Scallet's interest in the expression. The court again notes that "[w]hen an employee's speech substantially involves matters of public concern, ... the state must make a stronger showing of disruption in

---

**21.** Of course, the fact that Scallet's comments at faculty meetings are protected under the First Amendment does not suggest that other faculty members were required to agree with those comments. Indeed, there is more than enough room for debate with respect to the wisdom of teaching "diversity" in a speech and writing class.

order to prevail." *Hall,* 31 F.3d at 195 (citing *Connick,* 461 U.S. at 152, 103 S.Ct. at 1692–93); *see also Bieluch v. Sullivan,* 999 F.2d 666, 671 (2d Cir.1993) ("If the employee's speech substantially involved matters of public concern, the government must make a stronger showing of interference with operations than occurred in *Connick*"), *cert. denied,* —— U.S. ——, 114 S.Ct. 926, 127 L.Ed.2d 219 (1994). Defendants' aesthetic argument is simply not up to the task.

In summary, the court holds that Scallet's remarks at faculty meetings, and his placement of articles and cartoons outside his office, are protected forms of expression under the First Amendment but that his classroom speech is not so protected.

### D. Applying the Framework: "But For" Causation

■ Defendants, however, may still prevail on their motion for summary judgment if they can demonstrate that the record is clear that Scallet's protected speech—that is his comments at faculty meetings and his posting of articles and political cartoons outside his office—was not the "but for" cause of defendants failure to renew the contract.

The court concludes that there are no genuine issues of material fact with respect to this third prong of the analysis. Rather, it is evident that Scallet's protected speech was not the "but for" cause of his non-renewal.

As stated at the outset, this inquiry is a factual one and involves two steps:

In the first step, the employee bears the burden of establishing the requisite causation to prove that the protected speech was a motivating factor or played a substantial role in the discharge. *Mt. Healthy City Sch. Dist. Bd. Of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. [568] at 576, 50 L.Ed.2d 471 (1977). If the employee is able to prove such, the second step shifts the burden to the employer to put forward evidence that it would have fired the employee even in the absence of the protected speech. *Id.*

*Hall,* 31 F.3d at 193.

Scallet cites two alleged statements to support his contention that his speech was a "motivating" factor in defendants' decision not to renew his contract. First, Scallet maintains that Defendant Smith told him that Scallet was undermining Smith's objectives for the school and that while Smith had been trying to get Scallet fired for two years, now he was actually going to do it. Pl.Exh. Tab 1, *Scallet Dep.* at 222. Furthermore, when Scallet approached Defendant Rosenblum and asked him if Defendant Smith was responsible for the non-renewal, Rosenblum allegedly responded, "[y]es, you've got most of the story." *Id.* at 381.[22]

However, as discussed above, the First Amendment does not bar defendants from failing to renew Scallet's contract because of his in-class speech. It only prevents the defendants from retaliating against Scallet on account of his advocacy in faculty meetings and because Scallet posted articles and cartoons outside his office. Thus, the court concludes that these general comments, to be probative of improper motivation, must relate specifically to Scallet's comments at faculty meetings or to his posting of articles and cartoons outside his office. Recognizing the problems inherent in engaging in such an attribution analysis, the court simply notes that the focus of this litigation has been on Scallet's in-class speech.[23] Thus, the court hesitates to attribute the impetus for the alleged comments to Scallet's remarks at faculty meetings or to his posting of literature outside his office. Nonetheless, for purposes of this threshold analysis, the court will assume that some relatively minor degree of illegal motivation is evidenced by the comments.

---

22. While Defendants Smith and Rosenblum deny making these statements to Scallet, the court is ill-equipped to determine the credibility of the witnesses. That is a task properly left to the jury. *Summerlin v. Edgar,* 809 F.2d 1034, 1039 (4th Cir.1987) ("Credibility of conflicting testimony is not, on a summary judgment motion, an issue to be decided by the trial judge").

23. Indeed, Scallet is unable to provide specific examples of comments made at faculty meetings to which the defendants allegedly objected. Nor does he suggest that anyone other than Defendant Smith, on one isolated occasion, expressed disapproval of the materials Scallet posted outside his office.

1020

With respect to their burden, defendants, as discussed above, have presented an array of evidence to the effect that Scallet's demeanor with his colleagues, bordering in some instances on sexual harassment, together with his disruption of the delivery of the A & C course, created insurmountable problems, effectively forcing the defendants to deny his renewal. Thus, defendants argue that Scallet's speech at faculty meetings and his posting of articles and cartoons outside his office cannot be characterized as the but for cause of his non-renewal.

■ As a general proposition, the court hesitates to grant summary judgment where motivation is an essential element of the alleged offense. *Jones v. Dodson,* 727 F.2d 1329, 1337 (4th Cir.1984) ("where, as here, the evidence raises genuine issues as to the actual reason for an employee's discharge, that motivational issue must of course be resolved by the trier of fact"). However, the court believes this to be an instance where it is appropriate to enter summary judgment for defendants on causation grounds.

The court reiterates that Scallet's case is narrowed by the court's ruling that his in-class speech is not protected by the First Amendment. Thus, at trial, Scallet would need to prove that the defendants failed to renew his contract on account of his speech at faculty meetings and because of the literature he posted outside his office.

To support this latter contention, Scallet points to the one incident with Defendant Smith in the fall of 1991, several months before the non-renewal, when Smith allegedly told Scallet to remove some items from the wall outside his office. This strikes the court as being, at best, a "scintilla" of evidence of illegal motive on the part of one defendant. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Indeed, this incident has been but a footnote to the general arguments made throughout this litigation. Clearly, this incident standing alone, if credited by a jury, would not be enough to return a verdict for Scallet. *Id.*

Even assessing the incident in light of Scallet's related allegation that defendants retaliated against him in response to his speech at faculty meetings, the court concludes that Scallet cannot demonstrate "but for" causation. The only evidence Scallet musters to support his contention that defendants disapproved of his advocacy at faculty meetings is a statement Scallet attributes to Defendant Harris in May of 1991 to that effect. Even if credited, this statement, taken together with the incident with Defendant Smith, could not support a verdict for Scallet in light of the compelling and substantial evidence of Scallet's misconduct and inability to work with his colleagues in the A & C department.

Underlying this controversy—indeed, at the root of it—is the issue of the proper content of, and method of teaching, the A & C curriculum so as to achieve the course's writing and speech goals. Efforts by Scallet to include divergent diversity and multicultural elements in that curriculum appears to have been at the heart of the disaffections of the other instructors of the A & C classes, though coupled with strong complaints about Scallet's personal interrelations with those instructors. Further, having what it considered to be an integrated overall curriculum in the school, other professors saw this expansion of the A & C curriculum as intruding on their separate coursework and curriculum. As a pedagogical matter, the institution included diversity, for instance, in a course on Business Ethics, where it was believed to fit far better than in a course teaching writing and speech.

Failure by Scallet to observe and follow this institutional determination of which courses should embrace which matters within the particular course curriculum is, as observed above, at the very heart of this dispute. Such determinations are clearly legitimately pedagogical, and so clearly related to the institutional judgments appropriate to such discussions, that failure to appreciate and respond to them by Scallet caused the disruption and dissatisfaction so clearly manifested in the record.

■ As discussed at length above, the record indicates that Scallet's conduct was disruptive and that the entire A & C faculty had severe problems working with him. In-

deed, some of his conduct bordered on sexual harassment. Although Scallet maintains that these proffered reasons for his non-renewal are pretextual, he simply has not mustered sufficient evidence to demonstrate to a jury that defendants retaliated against him either for his advocacy in faculty meetings or because he posted articles and cartoons outside his office. In light of the wealth of evidence supporting defendants' non-retaliatory motivation for failing to renew Scallet's contract, the court concludes that defendants have carried their burden for summary judgment.

## V.

For the foregoing reasons, the court grants defendants' motion for summary judgment. An appropriate Order will this day issue.