**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 13 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

PATRICIA CRAVEN,

       Plaintiff - Appellant,

vs.

UNIVERSITY OF COLORADO
HOSPITAL AUTHORITY,

       Defendant - Appellee.

No. 99-1519

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 97-D-258)

Barry Douglas Roseman, Roseman & Kazmierski, L.L.C., Denver, Colorado, for
Plaintiff - Appellant.

Sonja S. McKenzie (Thomas S. Rice, with her on the brief), Senter, Goldfarb &
Rice, L.L.C., Denver, Colorado, for Defendant - Appellee.

Before **TACHA**, **KELLY**, Circuit Judges, and **LUNGSTRUM**[*], District Judge.

**KELLY**, Circuit Judge.

---

[*]The Honorable John W. Lungstrum, District Judge, United States District Court
for the District of Kansas, sitting by designation.

Dr. Patricia Craven filed this action against the University of Colorado Hospital Authority ("UH" or "the hospital"), asserting: (1) a federal claim under 28 U.S.C. § 1983 for retaliatory discharge in violation of the First and Fourteenth Amendments ("retaliatory discharge claim" or "§ 1983 claim"); (2) a pendent state claim for wrongful discharge in violation of public policy ("public policy claim" or "pendent state claim"); and (3) a second pendent state claim for breach of implied contract. The court granted summary judgment for UH on Dr. Craven's public policy claim; the others were tried to a jury, which returned a verdict for UH on both claims. The district court denied Plaintiff's Motion for a New Trial or, in the Alternative, to Amend or Alter the Judgment ("Rule 59 Motion"), and she appeals only as to the § 1983 and public policy claims. For the reasons stated below, we affirm.

Background

From March 21 through November 8, 1994, Dr. Craven was employed by UH as the Manager of Safety and Risk Management. IV Aplt. App. 1149. [1] In that capacity, she was responsible for "assessing, developing, implementing, and

_____

[1] Plaintiff's initial and supplemental appendices, both filed June 5, 2000, are cited herein as "I Aplt. App." and "II Aplt. App.", respectively. Her second supplemental appendix, filed August 29, 2000, is cited as "III Aplt. App." Plaintiff's third supplemental appendix, filed June 4, 2001, and erroneously titled "Second Supplemental Appendix," is cited as "IV Aplt. App."

monitoring the effectiveness of safety, security, and risk management programs for University Hospital." II Aplt. App. 1. The plaintiff became involved in a number of issues during her tenure at UH. For the purpose of this appeal, her involvement with problems relating to internal air quality, the infectious waste room, and radiation safety are the most significant.

I.      Internal Air Quality

Almost immediately upon assuming her position at UH, the plaintiff became concerned about fumes emissions from a construction project in the Barbara Davis Center, which was adjacent to the hospital. The Barbara Davis Center was part of the University of Colorado's Health Science Center ("HSC"), a separate but affiliated entity of UH. IV Aplt. App. 605. Fumes were seeping into UH's ventilation system, causing internal air quality ("IAQ") problems within the hospital. The record shows that Dr. Craven's approach      to the IAQ problem was confrontational and inflexible, and that she was consistently demeaning to HSC and other project personnel. After an early meeting with project personnel, the plaintiff circulated a memorandum to all affected areas of the hospital and to several high level officials at UH and HSC, reporting her conclusion that the fumes must be halted immediately. She did not consult her then-supervisor, Dr. Ann Jones, before circulating the memorandum. A few weeks later, the plaintiff invited ten to fifteen angry hospital employees to another meeting with project

personnel. The record contains overwhelming evidence that Plaintiff's conduct at that meeting was abrasive and uncooperative. E.g., id. at 200-03, 620-22, 664, 1110-12. According to one attendee, the "meeting turned into havoc" when Dr. Craven and the hospital employees began "chanting[:] Who wants to shut them down, let's take a vote, who wants to shut them down." Id. at 664. As a result of these and other incidents, the plaintiff was repeatedly advised to develop a more effective problem-solving approach. E.g., id. at 1109 (5/24/94 letter); id. at 1130 (5/28/94 e-mail); id. at 1105 (6/1/94 letter); [2] id. at 1004-05 (6/4/94 e-mail).

## II.    Infectious Waste Room

By July 1994, Dr. Craven had become aware that "[t]he refrigerated infectious waste room on the dock [was] being improperly used[,] resulting in an increased risk of blood borne pathogen exposure." Id. at 1017. In addition to

---

[2] Although the June 1 letter included a directive that Dr. Craven "[d]irect all comments about the safety of the Hospital to me as your immediate supervisor," IV Aplt. App. 1106, the record indicates that this directive was subsequently modified or withdrawn as impracticable. See id. at 224-26 (testimony of Dr. Craven, describing meeting on or about June 29 with Ruth Sens, Dr. Jones, and Donna Koeppel, a human resources representative, about the plaintiff's upcoming transfer to Ms. Sens' department, during which Ms. Koeppel had informed the plaintiff that after discussing the June 1 letter, she and both supervisors had agreed that "it would have been impossible for [Dr. Craven] to tell [Dr. Jones] even one-tenth of everything that was going on in safety," and that the June 1 directive "was to be disregarded"); id. at 729-30 (testimony of Dr. Jones that she never intended to prevent Dr. Craven from making safety-related comments to others in the hospital, only to require that the plaintiff keep her immediate supervisor informed of those concerns).

- 4 -

reporting to the safety committee and consulting with appropriate hospital personnel to remedy the problem, id. at 274, Dr. Craven and her staff took a number of photographs to be used in a presentation to the hospital's management council at their monthly meeting in August. Id. at 275-76, 399. Her then-supervisor, Ruth Sens, advised against the presentation on the grounds that given the management council's inability to solve the problem, the presentation "would have been a complete waste of time and cause nothing but stirring the group up." Id. at 549. Although plaintiff was allowed to compile a poster display, stand with it outside the meeting, and answer various managers' questions as they entered or left the meeting, id. at 277, 400, she was ultimately dissatisfied with the arrangement: "I wanted to present [the problem] to everyone, not just people that had the time to stop and talk." Id. at 278.

III.    Radiation Safety Officer

Finally, Dr. Craven also clashed with her supervisors regarding the hospital's Radiation Safety Officer ("RSO"), Dr. Tim Johnson. In addition to her concerns about Dr. Johnson's performance, e.g., id. at 294, 550-51, 1104, the plaintiff disagreed with the placement of the RSO position in the hospital's overall organizational structure. Id. at 398-99, 871-72. Plaintiff was advised to express these concerns to Joyce Cashman – her second-line supervisor and the hospital's then-Chief Operating Officer. Id. at 733-34. A few days later, Dr.

Craven called Dr. Ed Hendrick, then-Chief of HSC's Radiological Sciences Division, to discuss her concerns about the RSO. [3] Id. at 306-11. Dr. Craven told Dr. Hendrick that nurses had been unable to reach Dr. Johnson to respond to a radioactive iodine spill in a chemotherapy patient's room. The plaintiff noted that another employee had responded to the incident, but expressed concern as to who should be called upon in the future.

On November 3, 1994, Ms. Sens posted a note on Dr. Craven's door, informing her that her "communications with Ed Hendrick[]" had caused "major problems . . . between UH Administration and the Health Sciences Center" and requesting "copies of all notes, E-Mails, and the context of all phone messages that you have had with [Dr. Hendrick] concerning the role of the RSO." Id. at 1114. Plaintiff responded in writing, id. at 1115, and met with Ms. Sens the following day. After initially placing Dr. Craven on leave, Ms. Sens terminated

---

[3] There is no evidence that anyone ever expressly prohibited Dr. Craven from speaking with other people in addition to Ms. Cashman. Thus, UH's claim that Dr. Craven's telephone call to Dr. Hendrick constituted an act of direct insubordination is not supported by the evidence. Nonetheless, unless Dr. Craven was discharged in retaliation for engaging in protected speech activities, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick v. Myers, 461 U.S. 138, 147 (1983); see also id. at 146 ("[G]overnment officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. [O]rdinary dismissals from government service . . . are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.") (citations omitted).

Plaintiff's employment on November 8, 1994, due to her "lack of professional behavior and insubordination." Id. at 1102. The termination letter described Dr. Craven's conversation with Dr. Hendrick as "extremely inappropriate" and "in direct conflict with the information you [had] received from Joyce Cashman, Vice President of Operations, telling you to address issues regarding the radiation safety officer directly to her." Id.; see supra, note 3. Plaintiff's internal appeal was unsuccessful. Id. at 1051, 1116-19.

Procedural History

This action was originally filed in state court. In her complaint, Dr. Craven alleged state claims for breach of implied contract and wrongful discharge in violation of public policy, as well as a federal claim for retaliatory discharge in violation of the First and Fourteenth Amendments. [4] I Aplt. App. 1-6. After removing the case to federal court, UH moved for summary judgment as to each claim for relief. Id. at 12-13. With respect to Plaintiff's § 1983 claim, UH argued, inter alia, that the speech for which Dr. Craven was allegedly terminated did not touch on matters of public concern, id. at 39-41, and that UH's interests in

---

[4] The complaint contained allegations as to her speech regarding internal air quality and radiation safety, but not as to infectious waste. I Aplt. App. 2-3, ¶¶ 7, 9-11. Her third claim for relief did not specify the speech upon which her retaliatory discharge claim was premised. Id. at 4-5.

- 7 -

maintaining an efficient workplace – specifically, in maintaining collegial relations with HSC and its employees – outweighed Dr. Craven's interests in engaging in the speech at issue.     Id. at 41-43, 149-51.  Although the record before us does not contain the complete transcript of the hearing on that motion, it appears that UH's only successful argument on summary judgment was its claim of immunity under the Colorado Governmental Immunity Act ("CGIA") with respect to the state tort claim.     Id. at 154-58.  Thus, a jury trial was held on the implied contract and § 1983 claims.

At the close of Dr. Craven's case and again at the close of all the evidence, UH moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure.   IV Aplt. App. 504-27, 876-79.  In both motions, the hospital's primary contention was that the speech upon which Plaintiff's § 1983 claim was premised could not legally support a retaliatory discharge claim.  As in its motion for summary judgment, UH argued that Dr. Craven's speech did not relate to matters of public concern and that UH's interests, as an employer, in maintaining an efficient workplace outweighed her interests, as a citizen, in speaking out as she did.   Id. at 504-05, 517-22, 877.  The court rejected both motions, but limited its ruling as to the protected status of Plaintiff's speech to her telephone call to Dr. Hendrick.     Id. at 518, 520-21, 523-24, 878-79.     Both claims were then submitted to the jury, which returned a general verdict for the

defendant on each theory.    Id. at 1170-71.

On appeal, Plaintiff challenges the jury's verdict on her § 1983 claim on the basis of six alleged errors in Jury Instruction No. 22.


Discussion

I.    Federal Claim: Retaliatory Discharge in Violation of First and Fourteenth Amendments

An individual public employer is liable for retaliatory discharge when he terminates an employee because she engaged in protected speech.    Lybrook v. Members of Farmington Mun. Schools Bd. of Educ.   , 232 F.3d 1334, 1338 (10th Cir. 2000).  If the court determines that the speech at issue was not protected, the defendant is entitled to judgment as a matter of law.   [5]  If the speech was protected, the claim is then submitted to the jury, which must decide whether that speech "was a substantial or motivating factor in the termination,"    Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr   , 518 U.S. 668, 675 (1996), and if so, whether the employer "would have taken the same action even in the absence

---

[5] A determination that speech is "unprotected" in the context of a retaliatory discharge claim does not mean that the speech "is totally beyond the protection of the First Amendment. . . . We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the state can prohibit and punish such expression by all persons in its jurisdiction."    Connick , 461 U.S. at 147 (citations omitted).

of the protected" speech.    Id. (citing  Mt. Healthy City School Dist. Bd. of Educ.

v. Doyle , 429 U.S. 274, 287 (1977)).  If the jury resolves the foregoing causation

issues in the employee's favor, the individual who made the termination decision

may be liable for damages.    Id.  Because the mere fact "[t]hat a plaintiff has

suffered a deprivation of federal rights at the hands of a [public] employee will

not alone permit an inference of [governmental] culpability and causation,"       Bd. of

County Comm'rs of Bryan County, Okla. v. Brown    , 520 U.S. 397, 406-07 (1997),

a plaintiff who seeks to reach beyond an individual defendant to the employer –

as a public entity   – must also show that the constitutional violation is attributable

to that entity.   See, e.g. , City of St. Louis v. Praprotnik   , 485 U.S. 112, 121-23

(1988) (plurality opinion);   Pembaur v. City of Cincinnati   , 475 U.S. 469, 480-83 &

n.12 (1986) (plurality opinion);    Monell v. Dep't of Social Servs.   , 436 U.S. 658,

694 (1978).

We begin our analysis with the plaintiff's most fundamental objection: that

the district court refused to instruct the jury on her theory of the case.       [6]  See FDIC

---

[6] In pertinent part, the challenged instruction, No. 22, read as follows:

    In order for the Plaintiff . . . to recover from the Defendant . . .
on her claim of violation of the Plaintiff's constitutional right to
freedom of speech, you must find [that] . . . :

    (1)    The Plaintiff reported to Dr. Hendrick substantial
            concerns she had regarding a radiation spill at 8
            North of University Hospital, how that spill was

(continued...)

- 10 -

<u>v. Schuchmann</u>, 235 F.3d 1217, 1222 (10th Cir. 2000) (recognizing that "a party

is entitled to an instruction on [her] theory of the case . . . if he has offered

sufficient evidence for the jury to find in his favor")    (internal quotations and

citations omitted).  Specifically, Plaintiff claims that Instruction 22 erroneously:

> limited the scope of expressive activities on which [her] First
> Amendment retaliation claim was based just to her one telephone
> conversation with Dr. Hendrick.    <u>That was not the theory of Dr.
> Craven's case.</u>   She claimed retaliation based not only on that [1] one
> conversation, but also upon her earlier speech in connection with [2]
> indoor air quality problems resulting from construction activities at
> the Barbara Davis Center, [3] the storage and disposal of bio-
> hazardous waste, and [4] other matters.

Aplt. Br. at 16-17 (emphasis added).  Because Dr. Craven raised this objection to

the trial court before the jury retired,    <u>see</u> IV Aplt. App. 818, our review is de

novo.  <u>Karnes v. SCI Colo. Funeral Serv., Inc.</u>, 162 F.3d 1077, 1079 (10th Cir.

1998); <u>see also</u> Fed. R. Civ. P. 51.  In de novo review, we consider the

---

[6](...continued)
>> handled, its adverse impact on patient care and
>> overall hospital safety, and the unavailability of
>> the Radiation Safety Officer to attend to such
>> emergencies;
> (2)    The Defendant terminated the Plaintiff following
>        this contact with Dr. Hendrick;
> (3)    The Plaintiff's expression of her views to Dr.
>        Hendrick on the issues specified in paragraph (1)
>        above was a substantial or motivating factor in the
>        Defendant's decision to terminate the Plaintiff;
>        * * *

I Aplt. App. 362.

"instructions in their entirety and reverse only if we determine that the error was prejudicial in light of the record as a whole." Giron v. Corrections Corp. of Am., 191 F.3d 1281, 1287 (10th Cir. 1999).

The underlying premise of Plaintiff's objection to the limited scope of Instruction 22 is that the district court erred when it ruled that the telephone call was protected, but that her speech regarding the IAQ problem, the infectious waste room, and other safety matters was not. See IV Aplt. App. 520, 523-24, 878-79. In order to assess the merits of the objection, we must therefore determine whether any or all of the above-referenced speech was protected. Cf. Connick, 461 U.S. at 150 n.10 (noting that courts are obligated to "examine . . . the statements in issue and the circumstances under which they are made to see whether or not they . . . are of a character which the principles of the First Amendment . . . protect," and therefore "cannot avoid making an independent constitutional judgment on the facts of the case") (internal quotations and citations omitted, first omission in original). This is a purely legal inquiry, see id. at 148 n.7, which we conduct on the basis of the trial record, notwithstanding UH's failure to file a cross-appeal on this point. [7] See Koch v. City of

---

[7] Notably, UH has contested the protected status of the speech at issue throughout the course of this litigation. I Aplt. App. 39-43, 149-51 (Mot. for Summ. J.); IV Aplt. App. 504-05, 517-22 (first Rule 50(a) Mot.); id. at 877 (second Rule 50(a) Mot.).

Hutchinson , 847 F.3d 1436, 1441 n.14 (10th Cir. 1988) (en banc).

Of the four categories of speech upon which Plaintiff seeks to base her § 1983 claim, we must reject two at the outset. First, Dr. Craven's allegation that she was terminated in retaliation for her speech on "other matters" is patently inadequate. See Fed. R. App. P. 28(a)(9)(A). It is the place of counsel, not the Court of Appeals, to identify the specific instances of speech upon which the plaintiff seeks to base her claim. "We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." Entertainment Research Group, Inc. v. Genesis Creative Group, Inc. , 122 F.3d 1211, 1217 (9th Cir. 1997); see also United States v. Dunkel , 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Second, the plaintiff's reliance on her speech concerning the infectious waste room is misplaced. In any retaliatory discharge case, the threshold inquiry is whether the speech at issue involved a matter of public concern. Connick , 461 U.S. at 146-47. Although it is not entirely clear from Plaintiff's brief, she appears to argue that she was terminated, in part, for the proposal she made to Ms. Sens regarding a presentation to the management council about "the storage and disposal of bio-hazardous waste." Aplt. Br. at 17. Although it is well-settled that a public employee need not "spread [her] views before the public" in order to

pursue a claim for retaliatory discharge, Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 415-16 (1979), it is equally well-settled that "[i]n deciding whether a particular statement involves a matter of public concern, the fundamental inquiry is whether the plaintiff speaks as an employee or as a citizen." David v. City & County of Denver, 101 F.3d 1344, 1355 (10th Cir. 1997) (citing Connick, 461 U.S. at 147). In consulting with Ms. Sens regarding the propriety of presenting certain photographs to a group of managers with no direct responsibility for the photographs' subject matter, Plaintiff was obviously speaking as an employee – not as a citizen. Id. at 277, 549; see also id. at 277 (testimony of Dr. Craven, describing photographs as "really gross"). The Supreme Court has firmly rejected the view that "all matters which transpire within a government office are of public concern," noting that such a presumption "would mean that virtually every remark . . . would plant the seed of a constitutional case." Connick, 461 U.S. at 149. This is not the law. "[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over [such] internal office affairs" as the proper forum and composition for a presentation on infectious waste. [8] Id.

Strictly for the sake of analysis, we assume without deciding that Dr.

---

[8] To the extent Plaintiff's argument is based on the poster display, we reject it as well. The record before us contains no evidence that anyone with the authority to terminate Dr. Craven ever saw the display.

- 14 -

Craven's speech regarding internal air quality and radiation safety did involve matters of public concern, and we proceed to the second component of our inquiry: whether Dr. Craven's interests, "as a citizen, in commenting upon matters of public concern" outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). We have held that the balance of interests may favor the employer when "some restriction is necessary to . . . insure effective performance by the employee." Gardetto v. Mason, 100 F.3d 803, 815 (10th Cir. 1996) (internal quotations and citations omitted). Relevant considerations include: "whether the [employee's speech] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388 (1987) (citing Pickering, 391 U.S. at 570-73).

Because "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer," Umbehr, 518 U.S. at 676 (quoting Waters v. Churchill, 511 U.S. 661, 675 (1994) (plurality opinion)), courts have "consistently given greater deference to government

predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." Id. (quoting Waters, 511 U.S. at 673). The employer cannot, however, "rely on purely speculative allegations that certain statements caused or will cause disruption . . . ." Gardetto, 100 F.3d at 815. "Instead, the government must articulate specific concerns about the impact of an employee's speech, and those concerns must be reasonable and formed in good faith." Andersen v. McCotter, 205 F.3d 1214, 1218 (10th Cir. 2000) (citations omitted). The government need not "allow events to unfold to the extent that the disruption of the [operation] and the destruction of working relationships is manifest . . . ." Connick, 461 U.S. at 152; accord Moore v. City of Wynnewood, 57 F.3d 924, 934 (10th Cir. 1995) (noting that employer need not "wait for speech actually to disrupt core operations before taking action"). With these legal standards in mind, we turn to the speech at issue.

A.     Internal Air Quality

Plaintiff's speech regarding the IAQ problem had a significantly adverse impact on her relationship with various HSC personnel involved in the Barbara Davis Center construction project. Because UH and HSC have, in many senses, a "common mission," it is "extremely important" that employees of both institutions maintain "good collegial relationships" and "respect and trust each other." IV

Aplt. App. 736 (testimony of Ms. Cashman). Negative relationships between UH and HSC employees create "a lot of tension . . . [and] distrust," and have an adverse effect on the institutions' abilities to resolve problems. Id. at 737. With respect to the IAQ problem, it was particularly important for Dr. Craven to have a comfortable and collegial relationship with John Allison, HSC's project manager for the Barbara Davis Center, as well as the other HSC employees and contractors involved. Dr. Craven made no attempt to foster such a relationship. In fact, it appears that she went out of her way to antagonize Mr. Allison and his team, first by copying a memorandum that concerned him directly to his supervisor and other high level officials, id. at 980, then by bringing angry staff members to a meeting at which she was rude and disrespectful to her HSC colleagues, eventually becoming so emotional that she had to withdraw from participating in the meeting in order to collect herself. Id. at 203 (testimony of Dr. Craven).

As a result, the colleagues with whom the plaintiff was supposed to be working in harmony to resolve problems and further a common goal came to view her as "snide," "abrasive," "unprofessional," "unwilling to help," "degrading," "nonrespectful," id. at 620-22 (testimony of Mr. Allison), "completely inappropriate," "cynical," "argumentative," "uncooperative," incorporating "vigilante-ism," id. at 1110-12 (5/19/94 e-mail from Mr. Allison to Mr. Pauline), and tending to create "havoc". Id. at 664 (testimony of Mr. Kohler). Dr. Jones

expressed her concerns about Dr. Craven's approach to the IAQ problem on numerous occasions. Id. at 1108-09 (5/24/94 letter, advising the plaintiff "to slow down and think clearly," to be more sensitive to "the appropriate manner in dealing with patients, staff and faculty," to employ procedures that would "keep people calm rather than contribute to their anxiety," and commenting: "I find the surprise appearance of employees at a construction meeting to be thoroughly inappropriate and need to advise you that it should not reoccur"); id. at 1130 (5/28/94 e-mail: "[Y]our effectiveness has little to do with where you sit, but a lot to do with how you approach people."); see also id. at 1105-07 (6/1/94 letter); id. at 1004-05 (6/4/94 e-mail). On the record before us, it was more than reasonable for UH to conclude that Plaintiff's manner, including the manner in which she expressed herself to others, was having a negative impact both on her performance and on the hospital's operations. See Umbehr, 518 U.S. at 676. Because there is no basis for us to second-guess that judgment, we hold that the Pickering balance favors the defendant as to Dr. Craven's IAQ-related speech, and that her speech on that issue was not entitled to First Amendment protection for purposes of her retaliatory discharge claim.

B.   Radiation Safety

There is no dispute as to the substance of the plaintiff's telephone conversation with Dr. Hendrick. See IV Aplt. App. 307-09; cf. Waters, 511 U.S.

at 668. Several of the facts asserted by Dr. Craven in that conversation, however, were controverted by Dr. Johnson. He testified that the incident at issue did not involve a spilt infusion of intravenous radioactive iodine, cf. IV Aplt. App. 307 (testimony of Dr. Craven), but rather, a patient's reaction to radioactive iodine in capsule form. Id. at 686 ("[W]hat had happened was that the patient had thrown up."). Dr. Johnson also clarified the procedures to be followed when a radiation incident occurred. He explained that the hospital maintained a "call-down list" of several people – including him – that could be called upon to respond in the event of a radiation emergency. Id. at 680. Regardless, inadvertently false speech on a matter of public concern may still provide a basis for a retaliatory discharge claim. See, e.g. , Pickering , 391 U.S. at 572-73.

Even assuming that the call did involve matters of public concern, UH's interests in efficiency far outweigh the plaintiff's interests, as a citizen, in commenting on the radiation incident at issue to Dr. Hendrick. From the record before us, it appears that Plaintiff's conversation with Dr. Hendrick had a "detrimental impact on close working relationships for which personal loyalty and confidence are necessary, . . . interfere[d] with the regular operation of the enterprise," and "impede[d] the performance of the speaker's duties . . . ." Rankin , 483 U.S. at 388. As noted, it is essential that UH and HSC employees maintain collegial relationships so that they can work with, rather than against,

one another in solving problems that affect both institutions. See IV Aplt. App. 736-37. According to Ms. Sens, "major problems develop[ed] between UH Administration and the Health Sciences Center because of [Dr. Craven's] communications with Ed Hendrick[] concerning the radiation safety officer." Id. at 1114. Ms. Cashman testified that the plaintiff's conversation with Dr. Hendrick would lead to misunderstandings between UH and HSC's radiology department and call Ms. Cashman's credibility as a manager into question. Id. at 845-47.

With respect to the plaintiff's own performance, Ms. Sens testified that she had "explicitly advised Dr. Craven to make her concerns known to Joyce Cashman and then let it rest," id. at 553, but that Dr. Craven "would just not give it up," id., and that her persistence eventually went "from annoying to destructive." Id. at 574. After Dr. Craven's telephone call to Dr. Hendrick, Ms. Sens realized that if Dr. Craven was to continue in her position, she would require "[v]ery intense" supervision on a "[d]ay to day" basis, obligating Ms. Sens to constantly "check[] what she had said [and] who she had spoken to, a very inappropriate level of supervision" for a manager. Id. at 570-71. Simply put, Ms. Sens felt that she could no longer trust the plaintiff's judgment. Id. at 571. We find the foregoing evidence sufficient to tip the Pickering balance in favor of the

hospital with respect to the plaintiff's telephone call to Dr. Hendrick. [9]

Accordingly, that call provides no basis for Dr. Craven's § 1983 claim.

C.    Conclusion

In sum, of the four categories of speech cited in Dr. Craven's brief, none

can provide an adequate basis for her retaliatory discharge claim.  Her argument

regarding speech on "other matters" is too vague, her speech concerning

---

[9] Due in large part to its misconception of this case as involving an alleged prior restraint, the district court reached a different conclusion as to the balance of interests with respect to the telephone call.  IV Aplt. App. 523-24, 878-79. Instead of considering whether and to what extent the hospital's efficiency interests were compromised by speech in which the plaintiff had actually engaged, the court framed the question as whether the hospital's interests were directly furthered by the alleged requirements that Dr. Craven report only to her immediate supervisor or – with respect to radiation safety issues – only to Ms. Cashman.  Id. at 510-11, 517, 519, 523-24, 878-79;  cf. supra, notes 2-3 .  It also appears that the court conflated the  Pickering  balancing inquiry with the separate and distinct analysis required to determine whether a constitutional violation by an individual government employee – if proven – can be attributed to the governmental entity.  See, e.g. , IV Aplt. App. 508 (statement by the court: "I'm trying to understand what custom or policy was in place by the hospital authority that prevented the plaintiff from speaking out on a matter of public concern . . . ."); id. at 523 (statement by the court, concluding that the alleged reporting requirements did "in fact constitute a custom or policy that . . . [was] designed in a way that doesn't promote the efficiency of the public service being performed by the hospital authority");  cf. Monell , 436 U.S. at 694 ("[I]t is when execution of a government's  policy or custom  , whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.") (emphasis added).  As Plaintiff's counsel explained repeatedly, however, Dr. Craven was not attempting to show that she had been "prevented from speaking out," IV Aplt. App. 508, but rather, that she had been terminated in retaliation for protected speech.  Id. at 509.

- 21 -

infectious waste did not involve a matter of public concern, and even assuming that her IAQ- and radiation safety-related speech touched on matters of public concern, UH's interests, as an employer, clearly outweighed the plaintiff's interests, as a citizen, in commenting on those matters as she did. Accordingly, we hold that UH was entitled to judgment as a matter of law on Dr. Craven's § 1983 claim. Because the § 1983 claim should never have been submitted to the jury, the other five errors alleged in Dr. Craven's brief were harmless, and we need not address them. See Aplt. Br. at 16-17. We now turn to the plaintiff's pendent claim for wrongful discharge in violation of public policy.

II.     Pendent State Claim: Wrongful Discharge in Violation of Public Policy

Dr. Craven's public policy claim never reached the jury. Instead, the district court granted summary judgment for UH on sovereign immunity grounds, I Aplt. App. 154-55, rejecting Plaintiff's argument that § 24-10-106(1)(b) of the Colorado Governmental Immunity Act ("CGIA") waived UH's immunity as to her claim. Plaintiff renews this argument on appeal.

We review an award of summary judgment de novo, applying the same standard as the district court. Stamper v. Total Petroleum, Inc. Retirement Plan for Hourly Rated Employees, 188 F.3d 1233, 1237 (10th Cir. 1999). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact __and that the [appellee is] entitled to a judgment as a matter of law__." Fed. R. Civ. P. 56(c) (emphasis added). Plaintiff's appeal involves a narrow question of pure law: whether § 106(1)(b) waives the State's sovereign immunity with respect to a wrongful discharge action against a public hospital by a former employee whose job duties did not include patient care. Because the Colorado Supreme Court has not yet considered this question, we must predict what that court would do in order to resolve Plaintiff's claim. See Lytle v. City of Haysville, Kan., 138 F.3d 857, 868 (10th Cir. 1998).

Under § 106(1)(b) of the CGIA, "[s]overeign immunity is waived by a public entity in an action for injuries resulting from: . . . (b) The operation of a public hospital, correctional facility, . . . or jail by such public entity . . . ." Colo. Rev. Stat. § 24-10-106(1). The statute defines "operation" as "the act or omission of a public entity or public employee in the exercise and performance of the powers, duties, and functions vested in them by law with respect to the purposes of any public hospital, [or] jail . . . ." Colo. Rev. Stat. § 24-10-103(3)(a). Neither the CGIA nor any other statute defines "the purpose of [a] public hospital," cf. Neiberger v. Hawkins, 70 F. Supp. 2d 1177, 1194 (D. Colo. 1999) (citing statutory purpose of particular hospital), nor has the Colorado Supreme Court articulated a definition of a public hospital's purpose. The Colorado Court

of Appeals, however, has held that "the   primary purpose of a hospital is to provide medical or surgical care to sick or injured persons."     Sereff v. Waldman, No. 99CA1193, 99CA1497, 2000 WL 1785165, at *4 (Colo. App. 2000) (citing Plummer v. Little, 987 P.2d 871, 874 (Colo. App. 1999)).  While not binding on this court, "decisions by a state's intermediate appellate courts provide evidence of how the state's highest court would rule on the issue, and we can consider them as such."  Stauth v. Nat'l Union Fire Ins. Co. of Pittsburgh, 236 F.3d 1260, 1267 (10th Cir. 2001);   accord  West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237 (1940) ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.").

In contrast to the dearth of case law as to the purposes of a public hospital, the Colorado courts have considered the purposes of a jail or correctional facility – also referenced in § 106(1)(b) – on more than one occasion.  In both      Flores v. Colo. Dep't of Corrections, 3 P.3d 464 (Colo. App. 2000), and     Pack v. Arkansas Valley Correctional Facility, 894 P.2d 34 (Colo. App. 1995), the courts held that "the purpose of a correctional facility is to manage convicts safely and effectively . . . ."  Flores, 3 P.3d at 466;   accord  Pack, 894 P.2d at 37 ("purpose of the correctional facility [is] to confine inmates safely and effectively").  Although the

purpose of a correctional facility has no bearing on the present case, the courts' decisions in Flores and Pack are instructive on a related, yet more subtle, point. Taken together, those cases stand for the proposition that the alleged injury underlying the action must be "directly related to the purpose, as distinct from the operation," Pack, 894 P.2d at 37, of the § 106(1)(b) facility before the court will find that the State's sovereign immunity has been waived.

In Flores, for example, the court held that the State's sovereign immunity had been waived where the plaintiff alleged that she had slipped and fallen "on a wet floor inside the secure visitor's area of the [correctional] facility." 3 P.3d at 465. "[B]ecause the purpose of a correctional facility is to manage convicts safely and effectively, and [because] visitation within the facility directly assists in meeting that purpose, the maintenance of the visitor area within the custodial facility here is directly related to the purpose of the correctional facility." Id. at 466 (emphasis added). In Pack, however, the court had held that sovereign immunity was not waived with respect to a claim arising from a slip and fall in the correctional facility's parking lot. 894 P.2d at 37. In so holding, the court of appeals carefully distinguished the operation of the facility from its purpose:

> [T]he maintenance of visitor parking areas in order to facilitate prison visitation is not directly related to the purpose, as distinct from the operation, of a correctional facility. . . .
>      Although the [Department of Corrections] has established and is maintaining a visitors' parking lot, such function merely is ancillary to the purpose of the correctional facility. Therefore, it is

not part of the operation of the correctional facility as defined under the CGIA . . . .

Pack, 894 P.2d at 37 (emphasis added). We believe the Colorado Supreme Court would agree with this distinction.

Further, we believe that the Court would agree with the court of appeals' conclusion that "the primary purpose of a hospital is to provide medical or surgical care to sick or injured persons." Sereff, 2000 WL 1785165, at *4; see also Plummer, 987 P.2d at 874. Just as a parking lot is "merely . . . ancillary" to the safe and effective confinement of persons convicted of crimes, Pack, 894 P.2d at 37, the personnel action at issue here is only remotely related to UH's primary purpose. The relation between a hospital employee's discharge and the provision of "medical or surgical care to sick or injured persons" is particularly tenuous with respect to administrative employees like Dr. Craven. See, e.g., II Aplt. App. 1. Accordingly, we cannot construe § 106(b)(1) as a waiver of the State's CGIA immunity with respect to Plaintiff's claim. Although Plaintiff correctly notes that Colorado Supreme Court "broadly construe[s] the CGIA provisions that waive immunity in the interest of compensating victims of governmental negligence," Springer v. City & County of Denver, 13 P.3d 794, 798 (Colo. 2000) (citations omitted); accord Corsentino v. Cordova, 4 P.3d 1082, 1086 (Colo. 2000); State v. Nieto, 993 P.2d 493, 506 (Colo. 2000), the Court has also cautioned that "[n]onetheless, our primary task in construing a statute is to determine and give

effect to the intent of the legislature." Nieto, 993 P.2d at 506 (citation omitted). As explained, we do not believe the Colorado General Assembly intended § 106(1)(b) to be applied to claims like the one before us.

Accordingly, the jury's verdict on the plaintiff's § 1983 claim is VACATED and that claim is REMANDED to the district court for the entry of judgment as a matter of law in favor of the defendant. The district court's award of summary judgment in favor of the defendant on plaintiff's public policy claim is AFFIRMED.