**Maria CALEF, Plaintiff,**

v.

**Jean C. BUDDEN, Traci L. Batchelder, and Richland School District Two, Defendants.**

No. 3:03–3762–10.

United States District Court, D. South Carolina, Columbia Division.

March 18, 2005.

William Gary White, III, William White Law Firm, Columbia, SC, for Plaintiff.

Kathryn Long Mahoney, Kenneth Lendrem Childs, Thomas Kennedy Barlow, Childs and Halligan, Columbia, SC, for Defendants.

## ORDER

PERRY, District Judge.

In this action, Plaintiff, Maria Calef ("Calef") alleges that Defendants, Jean C. Budden, Traci L. Batchelder, and Richland School District Two ("the School District") denied her the opportunity to substitute teach at Dent Middle School ("Dent") in the School District in retaliation for exercising her First Amendment right to freedom of speech by speaking out against U.S. military involvement in Iraq and President Bush. This matter came before the Court for hearing on Defendants' Motion for Summary Judgment on December 29, 2004. Based on the memoranda, supporting materials, and the arguments of the parties, the undersigned finds that Defendants' motion should be granted, in its entirety.

## I. FACTS

Plaintiff, Maria Calef ("Calef") is a 59-year old female of Panamanian descent. She has been a United States citizen since 1985.

Calef began working for the School District on September 25, 2000 as a substitute teacher. In the School District, substitute teachers serve as employees at will. Over the course of Calef's employment with the School District, the District's Human Resources Office received numerous complaints about her performance, and in particular, her inability to properly interact with students and control her classes. From January 2001 to March 2003, the School District received six separate requests from school administrators to exclude Calef from substitute teaching at their schools. Despite these numerous concerns with her ability to relate to and control students, the School District permitted Calef to continue substitute teaching at schools that had not requested her removal from substitute lists.

The events that transpired on March 25, 2003 eventually resulted in Calef's suspension from substitute teaching for approximately a month and ban from substitute teaching at Dent Middle School ("Dent").[1] On that date, Calef was substitute teaching at Dent for a math teacher. At the end of the school day, the Dent principal, Randall Gary, received a complaint from a parent of a student, Colonel Brent Johnson. Col. Johnson advised Gary that Calef had worn a button during class bearing the slogan "War is Not the Answer" and had referred to President George W. Bush as "stupid" or an "idiot" and made other negative statements regarding American military policy in Panama and Iraq. Because Dent Middle School has a large percentage of students with parents in the military, Gary considered Calef's discussion, as reported, inappropriate and forwarded an Evaluation of Substitute Form to the School District's Human Resource office recommending her removal from further substitute duties at Dent.

Gary also called Dr. Daniel Cobb, who was then the Chief Human Resources Offi-

---

**1.** Calef disputes Defendants' version of what happened at Dent on March 25, 2003, and admits only to wearing the "War is Not the Answer" button to class. As explained *infra,* however, the employer's version of the facts is to be credited in the *Pickering/Connick* balance, provided that the employer has con-

ducted a reasonable investigation to reach its factual conclusions. The Court finds that, having acted reasonably upon the information it received and under the circumstances, Defendants are entitled to have their version of the facts credited for the purposes of analyzing Calef's First Amendment claim.

cer for the School District, and advised him of the inappropriate behavior that had been reported. Dr. Cobb directed Tiniece Javis, one of the School District's Human Resources Directors, to conduct an investigation of the allegations and determine what course of action the School District should take regarding Calef's employment. Javis and Jean Budden, the substitute supervisor for the School District, first decided to suspend Calef from any future substitute teaching assignments until the investigation had been completed. Calef received notice of this decision by letter from Budden dated March 26, 2003. Javis then asked Gary to interview the students in the class and obtain statements from them. The statements Gary received were consistent with the allegations that Col. Johnson had reported.

Meanwhile, in response to the allegations, Calef submitted a letter to Budden denying the reported conduct and taking a very aggressive tone. She accused Budden of discrimination, denying her "equal protection of the law," and of not being "straight and honest" with Calef. Although Calef admitted wearing the political button in class, she denied making the statements attributed to her about the war, the president, and U.S. foreign policy. However, after reviewing Calef's personnel file and prior problems, and considering Calef's expression of similar beliefs in their meetings with her, Javis and Budden decided that, more likely than not, Calef had engaged in the expression that the students reported.

Javis determined that Calef's classroom expression had violated several policies contained in the School District's Substitute Handbook. In particular, Javis concluded that, by wearing her political button and making derogatory comments about the president and military action in Iraq, Calef had violated handbook policies regarding Professional Behavior (pages 36–

37), Discretion and Confidentiality (pages 37–38), and Dos and Don'ts for Substitute Teachers (page 50). At deposition, Calef conceded that it would be inappropriate and a violation of School District policies to use abusive or derogatory language or use sarcastic or disrespectful phrases, and that it is a substitute's job to conduct a lesson chosen by the regular classroom teacher.

Rather than permanently removing Calef from substitute teaching duties at the remainder of the schools in which she was still eligible to teach, Javis and Budden decided to remove Calef only from substitute teaching responsibilities at Dent Middle School. Calef was reinstated to substitute at six other schools in the School District at which she had previously expressed interest in teaching and had not previously been barred by request of those schools' administrations. Javis informed Calef of this decision by letter dated April 30, 2003. The record before the Court also establishes that the School District has disciplined other employees for engaging in similar conduct

Between April 30 and the end May 2003, Calef declined to substitute teach anywhere in the School District despite being asked to teach on multiple occasions. Defendants took steps to ensure that Calef was not confused regarding her employment status and ability to teach at six schools in the District. Also, per Calef's request, Defendant Traci Batchelder provided her with a neutral letter of reference to aid her in seeking other employment if she chose.

Calef responded with an angry letter accusing the School District and Batchelder of acting outrageously and defaming her by addressing the incidents that had occurred at other schools prior to March 2003, of which Calef claimed she had previously not been made aware. Batchelder offered Calef the opportunity to meet with

Dr. Cobb, the School District's Chief Human Resources Officer, if she chose to pursue the matter further or was dissatisfied with Batchelder's review of her status. Calef chose not to meet with Dr. Cobb or pursue the matter any further with the School District.

Between June 2003 and December 17, 2003, Calef was offered substitute teaching opportunities on 131 occasions. Calef declined every opportunity to substitute teach during that time. She admits that she was not interested or available to substitute teach during this period because she was taking courses at the University of South Carolina and Midlands Technical College.

## II. ANALYSIS

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, after considering the full evidentiary record, there are no genuine issues of material fact. Fed.R.Civ.P. 56(c). The Court is not to weigh the evidence, but determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, the burden of summary judgment may be discharged by "pointing out to the court that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Evidence should be viewed in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. However, a "mere scintilla" of evidence will not preclude summary judgment. The court's inquiry is "not whether there is literally no evidence, but whether there is any [evidence] upon which a jury could properly ... find

a verdict for the party" resisting summary judgment. *Id.* at 251, 106 S.Ct. 2505.

### B. ELEVENTH AMENDMENT

Defendants argue that the School District and the individual defendants, to the extent that they have been sued in their official capacities, are immune from suit pursuant to the Eleventh Amendment to the U.S. Constitution. *See Smith v. School District of Greenville County*, 324 F.Supp.2d 786 (D.S.C.2004)(South Carolina school districts are "arms of the state" immune from suit pursuant to the Eleventh Amendment). Plaintiff conceded in her written response to summary judgment and at oral argument that the Eleventh Amendment bars her suit for damages against the District and against the individual defendants in their official capacities. However, she argues that the Eleventh Amendment does not bar claims for injunctive or other equitable relief against the individual defendants, presumably pursuant to *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

However, a review of Plaintiff's Complaint reveals no claim or prayer for injunctive relief. Moreover, the Court finds that Plaintiff is pursuing individual capacity claims against Defendants Budden and Batchelder and has not alleged any official capacity claims. Therefore, the Court finds that Plaintiff's claim against the School District itself is barred by the Eleventh Amendment, and that there are no official capacity claims to address.

### C. FIRST AMENDMENT CLAIMS AGAINST BUDDEN AND BATCHELDER IN THEIR INDIVIDUAL CAPACITIES.

Defendants argue that Plaintiff's remaining claims fail on the merits, and in the alternative, Defendants Budden and Batchelder are entitled to qualified immu-

nity. The Court agrees on both counts, and will examine each argument in turn.

### 1. *Merits of Plaintiff's First Amendment Claim.*

■ To prevail on a First Amendment retaliation claim, a Plaintiff must show: (1) that she engaged in protected expression regarding a matter of public concern; (2) that her interest in First Amendment expression outweighed the School District's competing interest in efficient operation of the workplace; (3) that she was deprived of some valuable benefit; and (4) that a causal relationship exists between her protected expression on matters of public concern and the loss of the benefit. *Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 351–52 (4th Cir.2000); *Huang v. Board of Governors of the Univ. of N.C.,* 902 F.2d 1134, 1140 (4th Cir.1990). If the plaintiff can prove that an adverse action was motivated in part by protected speech, the defendants can still avoid liability if they can prove by a preponderance of the evidence that they would have reached the same decision in the absence of any protected speech. *See Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Daniels v. Quinn,* 801 F.2d 687, 689 (4th Cir.1986).

■ The focus in this case is on the second element of the four-part test, or what is universally known as the *"Pickering* balance." In determining whether an employment decision violates the First Amendment, the Court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting efficiency of the public services it performs through its employees." *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (quoting *Pickering v. Board of Ed.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)); *Connick v. Myers,* 461 U.S. 138, 149, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Application of the *Pickering* balance presents a question of law for the Court. *Connick,* 461 U.S. at 150–54, 103 S.Ct. 1684.

### a. The Defendants' Version Of The Underlying Facts Must Be Credited.

■ In applying the *Pickering* balance, the Court must first determine whose version of the underlying facts is to be credited. As application of the *Pickering* balance is a question of law for the Court, so is the determination of the underlying facts as to which the balance applies. *Joyner v. Lancaster,* 815 F.2d 20 (4th Cir. 1987); *Scallet v. Rosenblum,* 911 F.Supp. 999, 1009 (W.D.Va.1996), *aff'd,* 106 F.3d. 391, 1997 WL 33077 (4th Cir.1997). Under *Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) the Supreme Court made clear that the employer's version of the facts is to be credited as long as after conducting a reasonable fact-finding inquiry, the employer honestly believed its version of the facts and disbelieved the plaintiff employee's story. *Id.* at 679–80, 114 S.Ct. 1878. The *Waters* Court further reasoned that if the *Connick–Pickering* test were applied to the facts as determined by a judicial factfinder, a government employer would be forced "to come to its factual conclusions through procedures that substantially mirror the evidentiary rules used in court." *Id.* at 675–76, 114 S.Ct. 1878. The Court's reasoning in *Waters* was based largely on its concern that government employers not be bound by strict evidentiary rules when making employment decisions. *Id.* Rather, government employers, like other employers, may rely on hearsay and personal credibility determinations in deciding what was actually said. *Id.* at 676, 114 S.Ct. 1878. Finally, the Court noted:

Of course, there will often be situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion. In those situations, many different courses of action will necessarily be reasonable. Only procedures outside the range of what a reasonable manager would use may be condemned as unreasonable.

*Id.* at 678, 114 S.Ct. 1878.

■ Thus, although Calef denies that she excoriated the president or spoke negatively about U.S. military policy in Iraq or Panama, these denials, no matter now vehement, cannot create a genuine issue of material fact for trial. The Defendants were entitled to believe and rely upon the version of the facts they developed after conducting what the Court considers a reasonable investigation of Calef's conduct. When Randall Gary, the school principal, received a report from a retired U.S. Army colonel, he had no reason to doubt its contents, and it was reasonable for District officials to rely upon it as the basis for a short-term suspension of Calef's teaching duties while they investigated the matter. The Colonel's report was subsequently substantiated or bolstered by interviews of students in the class, Calef's admission that she wore a "War is Not the Answer" button in class, Calef's written and verbal reaction to her brief suspension, and the School District's review of Calef's checkered employment record with the School District. While Calef might disagree, the Court finds the District's belief that Calef made the offensive comments during class time in front of students to be reasonable. Thus, the Defendants were entitled to rely on those facts in considering whether the School District's interest in decorum, instruction, and preventing Calef from discussing her personal political views with the apparent imprimatur of the School District outweighed Calef's right to engage in the speech reported to the Defendants.

**b. Application Of The *Pickering* Balance Favors The Defendants.**

■ Calef does not seriously contend that the *Pickering* balance weighs in her favor if the Court credits the Defendants' version of the facts. No hard and fast rule exists for determining whether the employer's interest in the efficient operation of its workplace trumps the employee's interest in speaking out on a matter of public concern. The Court must take into account the context of the employee's speech, including the employee's role in the government agency, and the extent to which it disrupts the operation and mission of the agency. *See Rankin v. McPherson,* 483 U.S. 378, 388–91, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Factors relevant to this inquiry include whether the employee's speech (1) "impairs discipline by superiors"; (2) impairs "harmony among co-workers"; (3) "has a detrimental impact on close working relationships"; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the "responsibilities of the employee within the agency"; and (9) makes use of the "authority and public accountability the employee's role entails." *Id.* The *Pickering* test recognizes that the government may impose restraints on the First Amendment activities of its employees that are job-related even when such restraints would be unconstitutional if applied to the public at large. *See United States v. National Treasury Employees Union,* 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).

■ The first two *Rankin* factors are not particularly applicable to the facts of

500

this case. However, Calef's expression, if unchecked, certainly may have led to impaired discipline by her superiors and disharmony among her co-workers. Applying *Rankin* factors (3) through (9) leads to the inescapable conclusion that the School District was justified in halting Calef's proselytizing her political beliefs to her students. Calef's expression had a detrimental impact on her relationships with the students in her class, some of whom had parents in the military and were concerned enough about her activities to share them with parents and administrators. Calef's assigned duties in following the lesson plan left for her were obviously impeded because she used instructional time to discuss her politics with the students in the class, rather than teaching them. This, in turn, interfered with the operation of the school and undermined its mission, which was teaching students the curriculum, maintaining classroom order and decorum, and providing students a positive role model in a substitute teacher who could present a lesson in a neutral manner without resort to inflammatory language. The manner in which Calef expressed her views in presenting the president as "stupid" and an "idiot," firmly supports the School District's position in the *Pickering* balance. *See, e.g., Craven v. University of Colorado Hosp. Auth.*, 260 F.3d 1218, 1228–29 (10th Cir.2001) (relying on abrasive, offensive manner of employee's speech); (discussing harsh and distrustful tone of employee's letter as important factor in *Pickering* balancing); *McBee v. Jim Hogg County*, 730 F.2d 1009, 1017 (5th Cir.1984) (en banc) (considering whether employee's speech was "sufficiently hostile, abusive or insubordinate as to disrupt significantly the continued operation of the [employer's] office").

As the Fourth Circuit has held

We recognize that, in deciding to enter the public teaching profession, a citizen does not waive or forfeit his right to comment on matters of public concern. But he can be expected, when doing so, to elect a method which does not frustrate provision of the service he is so employed to provide. This is particularly so when other methods of speech and conduct are readily available to communicate his concerns ...

*Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 159 (4th Cir.1992).

Further, and perhaps most importantly, Calef made inappropriate use of her role as a substitute teacher to foist her views on an impressionable, captive audience and with the apparent imprimatur of the School District, which had hired her as a substitute and assigned her to the class she was teaching on March 25, 2003. The School District had a sufficiently compelling interest in dissociating itself from Calef's political views and beliefs to warrant suspending her employment and barring her from future substitute duties at Dent.

Courts addressing similar expression by teachers have uniformly weighed the Pickering balance in the educational institution's favor. For example, in *California Teachers Assoc. v. San Diego Unif. Sch. Dist.*, 45 Cal.App.4th 1383, 53 Cal.Rptr.2d 474 (1996), the California Court of Appeals held that a school district's policy prohibiting teachers from wearing political buttons during class time did not run afoul of the First Amendment. In reaching this conclusion, the court noted that " ... when public school teachers and administrators are teaching students, they act with the imprimatur of the school district which employs them and ultimately with the imprimatur of the state which compels students to attend their classes." *Id.* at 479 (citing *Edwards v. Aguillard*, 482 U.S. 578, 582, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987)). Accordingly, the Court reasoned,

In this intimate and deferential environment, public school authorities may rea-

sonably conclude it is not possible to both permit instructors to engage in classroom political advocacy and at the same time successfully dissociate the school from such advocacy. In short, the very attributes of a successful teacher/student relationship make it reasonable for school authorities to conclude the only practical means of dissociating a school from political controversy is to prohibit teachers from engaging in political advocacy during instructional activities.

*Id.* See also *Scallet v. Rosenblum*, 911 F.Supp. 999, 1009 (W.D.Va.1996), (applying *Pickering* test to determine that institution's pedagogical interests outweighed professor's interest in discussing diversity issues in class), *aff'd*, 106 F.3d 391 (4th Cir.1997); *Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 369 (4th Cir. 1998) (teacher had no First Amendment right to set curriculum as she saw fit); *Stroman*, 981 F.2d at 154; *Fales v. Garst*, 235 F.3d 1122, 1124 (8th Cir.2001)(speech by teachers outweighed by school administration's interest in addressing turmoil created by the speech); *Khuans v. School Dist. 110*, 123 F.3d 1010, 1017 (7th Cir. 1997) (school district's interest in harmony between staff and administration outweighed plaintiff's right to complain as she saw fit about special education in the school district); *Hennessy v. City of Melrose*, 194 F.3d 237, 246 (1st Cir.1999)(court had "little difficulty concluding that the school's strong interest in preserving a collegial atmosphere, harmonious relations among teachers, and respect for the curriculum while in the classroom outweighed the appellant's interest in proselytizing for his chosen cause" of speaking out against abortion and art that he considered blasphemous); *Miles v. Denver Pub. Schs*, 944 F.2d 773, 775–76 (10th Cir.1991) (classroom is not a public forum and teachers and school districts can regulate speech as long as school has "legitimate pedagogical interests" such as insuring that students learn the curriculum, are not exposed to material inappropriate for their level of maturity, and dissociating itself from speech the school reasonably considered inappropriate to bear its imprimatur). The Court finds these authorities persuasive and finds that the *Pickering* balance weighs strongly in Defendants' favor, thus entitling them to summary judgment.

**c. "Same Action" Defense.**

In the alternative, the Court finds that Defendants have proven by a preponderance of the evidence that they would have taken the same action against Calef even if she had engaged in protected speech that could survive the *Pickering* balance. If a plaintiff can prove that an adverse decision was motivated in part by protected speech, the defendant can avoid liability if it can prove by a preponderance of the evidence that it would have reached the same decision in the absence of the protected speech. See *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Daniels v. Quinn*, 801 F.2d 687, 689 (4th Cir.1986). The undisputed testimony of the individual defendants is that they would have barred Calef from future substitute teaching at Dent based on the controversy she created and on her conduct during the investigation alone, as she had similarly been banned from substituting at numerous other schools for matters completely unrelated to her alleged protected speech or conduct. Calef has offered nothing to refute this testimony. Accordingly, the Court finds that the individual defendants are also entitled to summary judgment on the *Mt. Healthy* "same action" affirmative defense.

**2. *Qualified Immunity***

The Court also finds that even if Calef could avoid summary judgment on

**502**

the merits of her claim, the individual defendants are still entitled to summary judgment on the basis of qualified immunity. In analyzing a qualified immunity defense to a 42 U.S.C. § 1983 claim, if the plaintiff can establish the violation of a constitutional right, the next step is to determine whether the contours of the right were clearly established such that "a reasonable official would understand that what he [was] doing violate[d] that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Fourth Circuit has often recognized that "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, yet difficult to apply, and not yet well defined." *DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir. 1995); *see* also *McVey v. Stacy,* 157 F.3d 271, 277 (4th Cir.1998). It is the infrequent *Connick* claim that will survive a qualified immunity defense. *See DiMeglio,* 45 F.3d at 806; *Pike v. Osborne,* 301 F.3d 182, 185 (4th Cir.2002).

As the U.S. District Court for the Western District of Virginia recognized in *Scallet v. Rosenblum,* 911 F.Supp. 999, 1009 (W.D.Va.1996), *aff'd,* 106 F.3d 391, 1997 WL 33077 (4th Cir.1997) "the Supreme Court ... has never spoken to the level of First Amendment protection afforded teachers' in-class speech." *Scallet,* 911 F.Supp. at 1009, 1015. Because the court had been "called upon in [that] case to strike a difficult balance between important, competing interests," the plaintiff's alleged constitutional rights were not "clearly established" and qualified immunity was appropriate. *Id.* For the same reasons, even if Calef could establish a violation of the First Amendment via § 1983, Defendants Batchelder and Budden are entitled to qualified immunity as a matter of law.

## III. CONCLUSION

For the foregoing reasons, it is therefore ORDERED that summary judgment be GRANTED and plaintiff's claims dismissed in their entirety with prejudice.